Gary G. Kreep (SBN 066482)
Attorney at Law
932 D Street, Suite 2
Ramona, CA 92065
760-803-4029
gary@ggkmail.us

Attorneys for Plaintiffs
*Pine Valley House Resort, LLC, Nica Katherine Knite,*
*Descanso Junction Restaurant and Catering, Tammy*
*Cooker, BELGON Incorporated, Belynn R. Gonzales,*
*Christos Kapetanios, Christos Kapetanios (individual),*
*GONZO & FERN, LLC, Michael Aguirre, Steven*
*Asaro, Steve Asaro (individual), Michael Anthony*
*Andrews, Michael Anthony Andrews (individual), La*
*Salle Conglomerate, LLC, Daniel La Salle, Ramona*
*Fitness Center, LLC, Peter San Nicolas, Shayna San*
*Nicolas, Rudfords, LLC, Jeff Kacha, Acoustic Ales*
*Brewing Experiment, Inc., Tommaso Maggiore, HOO1,*
*Inc., HOO2, Inc., Craig MacDonald, Maria's Jalisco*
*Inc, Maria Osuna (individual) and ReOpen San Diego*
*Small Business Coalition*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT CALIFORNIA

| | |
|---|---|
| PINE VALLEY HOUSE RESORT, LLC, a California limited liability corporation, NICA KATHERINE KNITE; DESCANSO JUNCTION RESTAURANT AND CATERING, Inc., a California corporation, TAMMY COOKER; BELGON INC., a California corporation, BELYNN GONZALES;  CHRISTOS KAPETANIOS dba MR. D'S COCKTAIL LOUNGE, a California sole proprietorship, CHRISTOS KAPETANIOS dba CAFÉ LA MAZE, a California sole proprietorship, CHRISTOS KAPETANIOS dba ON THE | Case No.  **'21 CV0568 TWR BLM** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **SUBSTANTIVE DUE PROCESS (14th Amendment)** <br><br> PROCEDURAL DUE PROCESS  (14th Amendment) <br><br> EQUAL PROTECTION (14th Amendment) <br><br> UNCOMPENSATED TAKINGS |

ROCKS COCKTAILS, CHRISTOS KAPETANIOS, an individual; GONZO & FERN, LLC dba STEELE 94 RESTAURANT & BAR, a California limited liability corporation, MIGUEL AGUIRRE; STEVEN ASARO dba CAFÉ 67, a California sole proprietorship, STEVEN ASARO dba ANTIQUE ROW CAFÉ OF EL CAJON, a California sole proprietorship, STEVEN ASARO, an individual; MICHAEL ANTHONY ANDREWS dba MEAT MONSTERS GRILL, a California sole proprietorship, MICHAEL ANTHONY ANDREWS, an individual; LA SALLE CONGLOMERATE LLC dba EL AVOCADO – PLANT BASED FOOD, a California limited liability corporation, DANIEL LA SALLE; RAMONA FITNESS CENTER, LLC dba RAMONA FITNESS CENTER, a California limited liability corporation, PETER SAN NICOLAS, SHAYNA SAN NICOLAS; RUDFORDS RESTAURANT, LLC dba RUDFORDS, a California limited liability corporation, JEFF KACHA; ACOUSTIC ALES BREWING EXPERIMENT, INC. dba ENCINITAS ALE HOUSE, a California corporation, ACOUSTIC ALES BREWING EXPERIMENT, INC. dba CARLSBAD BREWING COMPANY, a California corporation, TOMMASO MAGGIORE; HOO1 INC. dba HOOLEYS PUBLIC HOUSE, a California corporation, HOO2 INC. dba HOOLEYS PUBLIC HOUSE, a California corporation, CRAIG MACDONALD;  MARIA'S JALISCO, INC. dba JALISCO'S CAFÉ, MARIA OSUNA and

(5th Amendment)

COMMERCE CLAUSE
(Art. 1, Section 8)

FREEDOM OF SPEECH, ASSEMBLY AND PETITION
(First Amendment)

TAKING OR DAMAGING PROPERTY FOR PUBLIC USE
(California Constitution ["CAL CON"], Article ["Art."] 1, Section ["Sec."] 19)

COMMANDEERING PRIVATE PROPERTY
(California Government Code ["CGC"] Sec. 8572)

EQUAL PROTECTION
(CAL CON, Art. 1, sec. 7)

RIGHT OF LIBERTY
(CAL CON, Art. 1, Sec. 1)

COMMERCE CLAUSE
(14th Amendment to the United States Constitution)

TERMINATION OF EMERGENCY
(CGC Sec. 8629)

ORIGINAL PROCLAMATION OF THE STATE OF EMERGENCY DID NOT MEET THE STATUTORY THRESHOLD FOR A STATE OF EMERGENCY
(CGC Sec. 8558)

NON-DELEGATION DOCTRINE
(CAL CON, Art. III, Sec. 3)

1   REOPEN SAN DIEGO SMALL
2   BUSINESS COALITION, an
    unincorporated membership
3   association;

4            *Plaintiffs*,

5   v.

6   GAVIN NEWSOM, in his capacity
7   as Governor of the State of
    California; ROB BONTA in his
8   capacity as Attorney General of the
    State of California; MARK
9   GHALY, in his capacity as
    Secretary of the California Health
10  and Human Services Agency;
    TOMAS ARAGON, in his capacity
11  as Director and  State Public Health
    Officer of the California
12  Department of Public Health;
    NORA VARGAS, in her capacity
13  as Vice Chair for the San Diego
    Board of Supervisors; JOEL
14  ANDERSON, in his capacity as a
    Member of the Board of
15  Supervisors for San Diego County,
    California; TERRA LAWSON-
16  REMER, in her capacity as a
    Member of the Board of
17  Supervisors for San Diego County,
    California; NATHAN FLETCHER,
18  in his capacity as a Member of the
    Board of Supervisors for San Diego
19  County, California; JIM
20  DESMOND, in his capacity as a
    Member of the Board of
21  Supervisors for San Diego County,
    California; DR. WILMA
22  WOOTEN, in her capacity as
    Public Health Officer for San Diego
23  County, California; ; TODD
24  GLORIA, in his capacity as the
    Mayor of San Diego and as a
25  Member of the City Council of San
26  Diego, California; JOE LACAVA,
27  in his capacity as a Member of the

28

City Council of San Diego, California; JENNIFER CAMPBELL, in her capacity as a Member of the City Council of San Diego, California; STEPHEN WHITBURN, in his capacity as a Member of the City Council of San Diego, California; MONICA MONTGOMERY STEPPE, in her capacity as a Member of the City Council of San Diego, California; MARNI VON WILPERT, in her capacity as a Member of the City Council of San Diego, California; CHRIS CATE, in his capacity as a Member of the City Council of San Diego, California; RAUL CAMPILLO, in his capacity as a Member of the City Council of San Diego, California; VIVIAN MORENO, in her capacity as a Member of the City Council of San Diego, California; SEAN ELO-RIVERA, in his capacity as a Member of the City Council of San Diego, California;  and DOES 1-10 inclusive,

*Defendants*.

## JURISDICTION

1.     This action asserts claims pursuant to 42 U.S.C. § 1983. The court has jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1337. Declaratory relief is authorized on the facts alleged pursuant to 28 U.S.C. § 2201. Injunctive relief is authorized pursuant to 28 U.S.C. § 1343(a).

2.     Venue of this civil action in the Judicial District for the Southern District of California is proper pursuant to 28 U.S.C. § 1391 (b) (1) and (2). Defendants maintain offices, exercise their authority in their official capacities, and have taken the actions at issue in this matter in the Judicial District for the Southern District of California.

## NATURE OF THE ACTION

3.     Plaintiffs bring this action to seek relief from ongoing arbitrary restrictions imposed and enforced by defendants which violate the fundamental liberties of plaintiffs and the citizens of the State of California and the United States and threaten them with irreparable harm.

4.     On March 4, 2020, Defendant Newsom proclaimed a State of Emergency in response to the spread of COVID-19.  Defendant Newsom's emergency proclamation was issued pursuant to Section 8625 of the California Government Code ("CGC"). In the proclamation of a State of Emergency, Defendant Newsom asserted:

> "WHEREAS if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care **may** exceed locally available resources, . . . ; and WHEREAS state and local health departments must use all available preventative measures . . . , which will require access to services, personnel, equipment, facilities, and other resources, **potentially** including resources beyond those currently available . . . ; and WHEREAS I find that conditions of Government Code section 8558(b), relating to the declaration of a State of Emergency, have been met; and WHEREAS I find that the conditions caused by COVID-19 are **likely** to require the combined forces of a mutual aid region or regions to appropriately respond; and WHEREAS under the provisions of Government Code section 8625(c), I find that local authority is inadequate to cope with the threat posed by COVID-19; . . ." (emphasis added).

5.     Starting March 19, 2020, in response to the spread of the novel coronavirus and COVID-19, defendant Gavin Newsom, in his official capacity as Governor of the State of California, has imposed emergency Orders purportedly pursuant to the authority granted him by California law. The emergency Orders issued by Governor Newsom and the restrictions implemented pursuant to such Orders are unprecedented in their scope and duration. Plaintiffs have, in addition, been subjected to Orders and enforcement measures implemented under color of state authority by San Diego County, California, and by the City of San Diego, California.  The Orders  and restrictions implemented  and enforced by defendants in response to COVID-19 have imposed widespread population lockdowns, broadly-based and open-ended business closures and restrictions, and pervasive and ongoing restrictions on the right of the people to travel, associate, and assemble to pursue otherwise lawful spiritual, political,

economic and social ends. These restrictions are unprecedented in the history of public health measures.

6.      During March, April, and May, 2020, COVID-19 did not spread in California at a rate comparable to the rate of spread in other countries.  At a press conference on March 19, 2020, rationalizing the Stay-at-Home Order, Defendant Newsom predicted a 20 percent hospitalization rate and 56 percent infection rate in California.  Had these predictions proven accurate, within weeks California would have experienced 25.5 million infections, over 5 million total hospitalizations, nearly 100,000 simultaneous hospitalizations, and a shortfall of 9,336 hospital beds.  As early as April 16, 2020, Defendant Newsom himself stated that the goal of bending and arguably flattening the curve had been achieved.  As of March 10, 2021, almost a year later, there have 3,513,678 confirmed cases of Covid, and, while this is a large number, it is less than 14% of what Governor Newsom predicted.

7.      While arguably justified in their inception as temporary measures imposed in the face of limited information, evidence and analysis available since at least May, 2020, establishes that the Orders and restrictions at issue in this matter cannot be justified as narrowly tailored to protect public health, and have, in fact, resulted in other significant, negative health outcomes, including lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings, and deteriorating mental health, leading to greater excess mortality in years to come. Given the availability of alternative measures that rationally address all legitimate public health concerns by targeting at risk populations, continued enforcement of the Orders and restrictions at issue in this matter would be arbitrary and capricious and would violate the fundamental rights of plaintiffs and the people of the State of California under the Fourteenth Amendment to travel, associate, pursue lawful professions, engage in lawful business enterprises, and seek gainful employment.

8.      The Orders and restrictions at issue in this matter were implemented solely through executive action, and without affording plaintiffs, and the people of State of

1    California, notice and an opportunity to be heard in violation of their right to procedural due

2    process under the Fourteenth Amendment to the United States Constitution.

3         9.      The Orders and restrictions at issue in this matter are based on arbitrary and

4    irrational classifications in violation of the right to equal protection guaranteed by the

5    Fourteenth Amendment. The Orders and restrictions are based on arbitrary classifications of

6    activities as "essential or "non-essential," that are not rationally related to promoting public

7    health, promote the interests of favored groups without reference to the impact of the activities

8    in question on the transmission of COVID-19, and shift the burden of the response to COVID-

9    19 to a limited class of persons and businesses.

10        10.     The Orders and restrictions at issue in this matter have interfered with distinct

11   investment-based expectations in private property without compensation, and have thereby

12   affected uncompensated takings in violation of the Fifth Amendment to the United States

13   Constitution.

14        11.     The Orders and restrictions at issue in this matter unreasonably burden

15   interstate commerce in violation of Article I, Section 8, Clause 3 of the US Constitution.

16        12.     Plaintiffs have been seriously harmed by the Orders and restrictions at issue in

17   this matter, and they are threatened with irreparable harm if the Orders and restrictions at issue

18   are not enjoined.

19        13.     Plaintiffs Pine Valley House Resort, LLC dba Pine Valley House, dba Silver

20   Queen Saloon, Descanso Junction Restaurant and Catering, Inc., dba Descanso Junction

21   Restaurant, BELGON Incorporated, dba Garcia's Mexican Restaurant, Christos Kapetanios

22   dba Mr. D's Cocktail Lounge, Café` la Maze, and On the Rocks Cocktails, GONZO & FERN,

23   LLC dba Steele 94 Restaurant and Bar, Steven Asaro dba Café 67 and Antiques Row Café of

24   El Cajon,; Michael Anthony Andrews dba Meat Monsters Grill, La Salle Conglomerate, LLC

25   dba El Avocado – Plant based Food, Rudfords, LLC dba Rudfords, Acoustic Ales Brewing

26   Experiment, Inc. dba Encinitas Ale house and Carlsbad Brewing Company, HOO1, Inc., dba

27   Hooleys Public House,  and HOO2, Inc., dba Hooleys Public House are restaurants located in

28

San Diego County serving the general public. Plaintiff ReOpen San Diego Small Business Coalition (the "Coalition") is a membership association of dining and drinking establishments, gyms, dance studios, martial arts studios, hair salons, and other businesses and individuals in the City of San Diego, and/or in San Diego County, California. Additionally, Christos Kapetanios, dba Mr. D's Cocktail Lounge, Café` la Maze, and On the Rocks Cocktails are restaurants located in the City of Chula Vista, California.  Further, Rudfords, LLC, is a restaurant located in the City of San Diego.

14.    Plaintiffs have been damaged by the arbitrary and ever-changing Orders and restrictions at issue. The Orders at issue in this matter initially prohibited restaurant plaintiffs from providing indoor and outdoor dining service. This restriction threatened to bankrupt restaurant plaintiffs. The restriction on indoor and outdoor dining was then lifted, but was soon reimposed, once again threatening restaurant plaintiffs' ability to stay in business, and depriving plaintiffs of the benefit of their investment in measures implemented to prevent the spread of COVID-19 upon reopening. Although restaurant plaintiffs' businesses are continuing to operate on a limited basis, they will be unable to continue as viable going concerns, as the onset of winter weather curtails, or, in some locations, eliminates outdoor dining, which, under the restrictions currently in place, has allowed some of them to remain in business. Moreover, under the legal authority under which they purport to act, defendants are able to reinstate and/or change any previously imposed Orders and restrictions at any time, as they have already done on a number of occasions, if Plaintiffs' request for preliminary and permanent injunctive relief is not granted.

15.    Plaintiffs have also been subjected to arbitrary, irrational, and discriminatory enforcement by San Diego County, California in violation of their right to equal protection under the Fourteenth Amendment. San Diego County intentionally, irrationally, and arbitrarily has issued cease and desist and closure orders as to certain plaintiffs, while overlooking violations by similarly situated, and other, businesses.   The County of San Diego and the City of San Diego have intentionally, irrationally, and arbitrarily issued cease and desist orders,

1   criminal citations threatening fines, and closure orders as to certain plaintiffs, while

2   overlooking violations by similarly situated, and other, businesses.

3        16.    San Diego County has also violated plaintiffs' First Amendment rights.

4   Following the arbitrary closure orders imposed by San Diego County, other plaintiffs

5   organized the Coalition, sought redress from the cease and desist orders from San Diego

6   County, and sought to mobilize public opposition to the Orders and restrictions at issue in this

7   matter. San Diego County retaliated against plaintiffs' protected, expressive, activity by

8   initiating harassing visits from County of San Diego Safe Reopening Compliance Teams,

9   including uniformed Sheriff's Deputies, within days of public opposition to the restrictions by

10   certain of plaintiffs. These were nothing less than an attempt to directly silence plaintiffs'

11   legitimate expressive activities in opposition to the Orders and restrictions at issue

12        17.    Defendants' violations of plaintiffs' fundamental rights have inflicted

13   substantial financial losses upon plaintiffs, unreasonably infringed upon plaintiffs' liberty

14   interests, resulted in uncompensated takings, and will result in irreparable harm to plaintiffs if

15   enforcement of the Orders and restrictions at issue in this matter is not enjoined.

16                                   **PARTIES**

17        18.    Plaintiff Pine Valley House Resort, LLC, is a for-profit California limited

18   liability corporation operating under the names Pine Valley House and Silver Queen Saloon,

19   which is, and at all relevant times was, engaged in providing dining and bar service to

20   customers from a storefront location in Pine Valley, San Diego County, California. Plaintiff

21   Nica Katherine Knite is the managing member of Pine Valley House Resort, LLC.

22   As a result of the unconstitutional Covid restrictions, on March 18, 2020, Plaintiff was

23   forced to lay off 23 staff, who had only been hired the previous December and

24   January. Plaintiff is informed and believes and thereon alleges that at least 13 of

25   these former employees exhausted their Unemployment Benefits.  5 were re-hired in

26   May, 2020.  Plaintiff Nica Knite and her son, Jonathon, transitioned the business to

27   "take-out only." Jonathon has worked 14 hours/day and Ms. Knite has worked 12 hours/day 6

28

days/week, to keep the new business open.  Even once Plaintiff was allowed to start outdoor service, and, then, restricted indoor service, revenue levels were substantially diminished from pre-pandemic levels.

Pine Valley House, with its Silver Queen Saloon, was constructed in 1923 by famed architect Richard Requa (Old Globe; CA Exposition Balboa Park) as a backcountry destination resort and restaurant.  It was one of the 7 roadhouses scattered throughout the communities along the transit corridors of the area known as San Diego's Mountain Empire ("SDME"). Comprised of 13 small towns and communities, SDME is located in the Southeast corner of San Diego County and is home to almost 20,000 residents.  Throughout the 19th and 20th Centuries, these small towns thrived, becoming the region's rural foothold for ranching, farming, and forest, mountain and high desert recreation.  Anchored by the Laguna Mountain Airforce Base ("LMAFB") and supported by the San Diego-Arizona transit corridor, each of these hamlets developed micro-economies, and deep roots, which included stagecoach lines, railroad construction, Buffalo and Calvary Soldiers, and more. Despite the Great Depression, the small towns developed individual and collective communities which thrived, and, in many cases, became notable destinations. However, with the construction of Interstate 8, which wiped out the Old Highway 80 transit corridor, and the closure of the LMAFB, SDME slid into a decades long depression. The vast majority of small businesses (including the 6 other restaurant/lodging roadhouses) folded.  Many of the residents left the area, and many residences sat vacant for years.  Much of SDME "fell off the map."

A wave of positive change started with the post Great Recession recovery in about 2010. The region's mountain bikers, cyclists, and motorcyclists began rediscovering SDME's highways, roads, and trails. Cash strapped families longing for vacation and recreation returned to SDME's campgrounds and hiking trails. The Pacific Crest Trail ("PCT") gained international acclaim with a book-made-movie bringing notoriety to the

PCT origin communities.  A perfect storm of synchronized timing brought awareness of, and interest in, SDME, along with the "spill-over" of San Diegans seeking more affordable housing with a rural and/or nostalgic lifestyle.  In October, 2011, Ms. Knite restored and reopened the historic log cabin Pine House Cafe & Tavern on top of Mt. Laguna (c.1926), which had been vacant for 18 years. Originally, Plaintiff Knite only planned for a Saturday and Sunday Breakfast and Lunch eatery.

In 2018, Ms. Knite purchased the Pine Valley House property. It was in rough shape, as the commercial kitchen and one of the property's 8 cottages had been both condemned.  It took 15 months of 7 days/week and over $1 million, but, on December 28, 2019, Plaintiff received the County's Authorization to operate. In November, 2019, a Pine Valley Job Fair was held and had more than 75 applicants (demonstrating just how much good jobs in the area are needed).  In late January, 2020, the restaurant opened, having hired and trained 25 staff, making Plaintiff the largest local non-governmental employer in the SDME region (Border Patrol, School District, SDGE have more employees). The initial opening was the Coffee Bar with Drive-thru and The Saloon & Grill, with plans to open the Family Style Steakhouse in the coming weeks, the lodging in a few months, as well as a Mercantile, Bakery and Gallery, a neighborhood fitness center/gym, and a laundromat. Five weeks later, March 16, 2020, the COVID restrictions were announced, causing the layoff of 23 employees.

A by-product of the COVID restrictions included problems with Plaintiff obtaining its Liquor License.  The process was started in February, 2020 (pre-COVID), but the License was not issued until November 12, 2020.  This delay was directly linked to COVID restrictions which closed ABC offices for in-person work, and have affected processes, including mail and shipping in this regard.  The loss of revenue for lack of sale of liquor, beer, and/or wine is incalculable.

Ms. Knite is at grave risk of losing her home because she has had NO income, a year's worth of electric bills, water bills, lapsed insurances, unaddressed medical needs, etc.

If the current business location pays Plaintiff Knite and her son for their work, there will not be enough money to also pay the staff. Without the staff, Plaintiff cannot function or effectively operate.

Take-out only is not an option for Plaintiff, as, even though SDME has a population of nearly 20,000, 95% of those live 25 minutes or more, mostly off of windy, rural dirt roads - not around the corner for easy take-away, "bring home hot food meals." Additionally, 85% of Mountain Empire is at 4000 ft. elevation, or higher.  While there may be occasional days with high temperatures in the 50's, common temperatures from November through April are in the 30's and 40's, with many times 20's and even teens. This is not feasible for outdoor service, and, in fact, is dangerous.

19.    Plaintiff Descanso Junction Restaurant and Catering, Inc., is a for profit California corporation operating under the name Descanso Junction Restaurant Inc., which is, and at all relevant times was, engaged in providing dining and bar service to customers from a storefront location in Descanso, San Diego County, California. Plaintiff Tammy Cooker is the President of Descanso Junction Restaurant and Catering, Inc. Plaintiff's location is also in SDME which poses similar constraints regarding as those noted for Pine Valley House, LLC for take-away food service and outdoor dining.

20.    Plaintiff BELGON Incorporated is a for profit California corporation operating under the name Garcia's Mexican Restaurant, which is, and at all relevant times was, engaged in providing dining and bar service to customers from a storefront location in Carlsbad, San Diego County, California. Plaintiff Belynn Gonzales is the President of BELGON Incorporated.

21.    Plaintiff Christos Kapetanios is a sole proprietor in California operating under the names Mr. D's Cocktail Lounge and On the Rocks which are and were at all relevant times engaged in providing dining and bar service to customers from storefront locations in Chula Vista, San Diego County, California. Additionally, plaintiff Christos Kapetanios is a sole proprietor in California operating under the name Café la Maze which is, and was, at all

relevant times engaged in providing dining and bar service to customers from a storefront location in National City, San Diego County, California.

During the last closure in December, 2020, Plaintiff decided to stay open as many of his employees were not receiving their unemployment benefits, or were not receiving enough unemployment benefits to pay their living expenses.

Cafe La Maze received a cease and desist letter on December 23, 2020, and Mr. D's Cocktails Lounge received a cease and desist letter on December 28, 2020. Plaintiff received a visit, on January 7, 2021, from an agent of the County of San Diego, accompanied by 2 San Diego County Sheriff Deputies.  The County agent asked Plaintiff if he was willing to close his businesses down, and he declined to do so. The agent from the County of San Diego told Plaintiff that the case would "escalate" to the San Diego County District Attorney's office, where a warrant for his arrest would issue and he would be fined. The agent advised Plaintiff that this would concern both of Plaintiff's business locations, Cafe La Maze and Mr. D's.

Plaintiff is informed and believes and thereon alleges that the County of San Diego notified the California Alcohol and Beverage Control ("ABC") of its actions, and, the same day, Plaintiff received a phone call from an ABC agent named Anthony.

On January 12, 2021, Plaintiff received a visit from an agent from the ABC, and was served with a Notice of Violation.  On February 11, 2021, Plaintiff received a phone call from an ABC agent, advising him that he would be receiving formal charges from the ABC within 2 weeks, and that even if the restrictions on dining indoors were rescinded, the charges would be acted upon against him.

Additionally, both of Plaintiff's businesses are currently being threatened with the loss of their liquor licenses by the ABC, for daring to stay open in the face of the unconstitutional Covid restrictions

      22.     Plaintiff GONZO & FERN, LLC, is a for profit California limited liability corporation operating under the name Steele 94 Restaurant and Bar, which is, and at all

1  relevant times was, engaged in providing dining and bar service to customers from a storefront

2  location in Spring Valley, San Diego County, California.

3  Plaintiff was required to lay off all of its employees and permanently close its restaurant on

4  March 23, 2020, as a result of the various unconstitutional Covid restrictions placed upon it.

5  Plaintiff was restructured, with a new business plan, requiring new investment in more

6  "Covid-compliant" facilities, including outdoor dining.  After purchasing new equipment,

7  Plaintiff reopened October 19, 2020.  Plaintiff was able to hire some of the laid off employees

8  back, however, it has had to cut employee work hours and modify work schedules due to the

9  numerous changes in the various Covid restrictions imposed in the months since the reopening

10 of the business.  Plaintiff is informed and believes and thereon alleges that most or all of its

11 current or former have exhausted their unemployment benefits.

12 Plaintiff lost 100% of its income during the period of March 23, 2020, until October 19, 2020,

13 when it reopened.  Since reopening, income has been down 75%, due to the various, changing

14 Covid restrictions, and weather affecting outdoor dining.

15 On January 12, 2021, agents from Alcohol and Beverage Control arrived at Plaintiff's business

16 location, with San Diego County Sheriff Deputies, scaring customers, several of whom

17 immediately paid their bill and left the premises, leading to negative publicity for Plaintiff's

18 business.  Additionally, Plaintiff's business is currently being threatened with the loss of their

19 liquor license by the ABC, for daring to stay open in the face of the unconstitutional Covid

20 restrictions

21      23.    Plaintiff Steven Asaro is a sole proprietor in California, operating under the

22 name Café 67, which is, and at all relevant times was, engaged in providing dining and

23 drinking service to customers from a storefront location in Lakeside, San Diego County,

24 California. Additionally, plaintiff Steven Asaro is a sole proprietor in California, operating

25 under the name Antiques Row Café of El Cajon, which is, and at all relevant times was,

26 engaged in providing dining and drinking service to customers from a storefront location in El

27 Cajon, San Diego County, California.

28

Between the two restaurants, Plaintiff was forced to lay off 20 employees in March, 2020. Plaintiff was able to hire back a few employees in May, 2020, but was forced to lay off 19 employees in July, 2020.  Plaintiff estimates that it has lost at least 35% of its revenue as a result of the unconstitutional Covid restrictions.

24.     Plaintiff Michael Anthony Andrews is a sole proprietor in California operating under the name Meat Monsters Grill, which is, and at all relevant times was, engaged in providing dining and drinking service to customers from a storefront location in Ramona, San Diego County, California. Within days after publicly announcing that he would not shut down his restaurant, Plaintiff received a Cease and Desist Order from the County of San Diego.

25.     Plaintiff La Salle Conglomerate, LLC, is a for profit California limited liability corporation operating under the name El Avocado – Plant Based Food, which is, and at all relevant times was, engaged in providing dining and drinking service to customers from a storefront location in La Jolla, San Diego County, California. Plaintiff David LaSalle is Chief Executive Officer of LaSalle Conglomerate, LLC.

26.     Plaintiff Rudfords, LLC, is a for profit California limited liability corporation operating under the name "Rudfords", which is, and at all relevant times was, engaged in providing dining and bar service to customers from a storefront location in San Diego, San Diego County, California.  Plaintiff Jeff Kacha is the owner of Rudfords, LLC.

27.     Plaintiff Acoustic Ales Brewing Experiment, Inc., is a for profit California corporation operating under the name Encinitas Ale House, which is, and at all relevant times was, engaged in providing dining and bar service to customers from a storefront location in Encinitas, San Diego County, California. Additionally, plaintiff Acoustic Ales Brewing Experiment, Inc., is a for profit California corporation operating under the name "Carlsbad Brewing Company", which is, and at all relevant times was, engaged in providing dining and bar service to customers from a storefront location in Carlsbad, San Diego County, California. Plaintiff Tommaso Maggiore is the President of Acoustic Ales Brewing Experiment, Inc.

1    Due to the various unconstitutional Covid restrictions, Plaintiff has been forced to lay off 30

2    employees, only 12 of which it has been able to rehire.  As a result of the numerous changes in

3    the Covid restrictions, Plaintiff has had to reduce the hours worked by those that it has been

4    able to rehire.

5    Plaintiff is informed and believes and thereon alleges that its current and/or former employees

6    exhausted their unemployment benefits while not employed by Plaintiff.

7    Plaintiff estimates that it has lost 40% of its revenue as a result of the government imposed

8    Covid restrictions.

9    A representative from ABC came into Plaintiff's Encinitas location and threatened to

10    revoke its liquor license, the loss of which would cripple Plaintiff's income.

11    San Diego County officials have visited Plaintiff's Carlsbad location several times,

12    threatening legal action if the business did not comply with the Covid restrictions.

13    Local law enforcement has similarly visited this location.

14            28.      Plaintiff HOO1, Inc., is a for profit California corporation operating under the

15    name Hooleys Public House , which is, and at all relevant times was, engaged in providing

16    dining and bar service to customers from a storefront location in El Cajon, San Diego County,

17    California. Plaintiff Craig MacDonald is the President of HOO1, Inc.

18            29.      Plaintiff HOO2, Inc., is a for profit California corporation operating under the

19    name Hooleys Public House , which is, and at all relevant times was, engaged in providing

20    dining and bar service to customers from a storefront location in La Mesa, San Diego County,

21    California.  Plaintiff Craig MacDonald is the President of HOO2, Inc.

22            30.      Plaintiff Ramona Fitness Center, LLC ("RFC"), is a for profit California limited

23    liability corporation operating under the name Ramona Fitness Center, which is, and was, at all

24    relevant times engaged in providing gym and fitness center service to customers from a

25    storefront location in Ramona, San Diego County, California.  Plaintiff Peter San Nicholas is

26    RFC's chief operating officer.

27

28

RFC was forced to lay off 10 out of its 23 employees as a result of the unconstitutional Covid restrictions.  Since reopening, Plaintiff has rehired 4 of those employees back.  Plaintiff did close its business, for a period of time, but was forced to reopen so that Mr. San Nicholas could feed his family and try to pay his business and other financial obligations, including his employees.  RFC has sustained a 50% drop in its revenue due to the Covid restrictions.

In 2020, the San Diego County District Attorney's Office held a press conference to announce that 5 misdemeanor charges had been filed against Mr. San Nicholas, as a result of RFC reopening for business.  During the press conference, it was announced that RFC was the first business in San Diego County to be criminally prosecuted for failing to comply with the constantly revised Covid restrictions, and that Mr. San Nicholas was facing $5,000.00 in fines. Although the misdemeanor charges were ultimately dropped, RFC has been visited by San Diego County law-enforcement a total of 7 times, but has received only one cease-and-desist order, and that was in January, 2021.

31.     Plaintiff ReOpen San Diego Small Business Coalition (the "Coalition") is an unincorporated membership association of businesses and individuals, registered as such with the State of California operating dining and drinking establishments, gym and fitness center establishments, martial arts training, dance studios, hair styling salons, and other business products and services in San Diego County, California. The Coalition is named as a representative of the interests of its members which include more than 20 member organizations, individuals, and, additionally, includes co-plaintiffs.  Plaintiff Nica Katherine Knite is the Managing Member of ReOpen San Diego Small Business Coalition.

As a result of the unconstitutional Covid restrictions, one of Coalition's members had to lay off 5 of its employees, and estimates that it has lost 40% of its revenue.  Another had to lay off all 16 of its employees, has been able to only rehire 2, but only as part-time workers, and estimates that it has lost 70% of its sales.  Another had to lay off 7 employees, has not been able to rehire any of these workers, is informed and believes and thereon alleges that one at least former employee has exhausted all unemployment benefits, estimates that it has lost over

75% of its revenue, and is aware that one of its employees has been criminally charged for being on the premises.  Another had to lay off 68 of its employees, and has been able to only rehire 43.  Another closed down on March 17, 2020, and laid off 24 of its employees, rehired 15 when it was allowed to serve outside, and then laid off and rehired according to the whipsaw changes in the Covid restrictions, estimating that it has lost 47% of its revenue. Another estimates that it is losing about $30,000.00 per month in income.  Another laid off all 10 of its employees on March 16, 2020, rehired 5 to part-time work, and estimates that it has lost 50% of its revenue.  Another has been visited multiple times by San Diego County Deputy Sheriffs as well as San Diego County health officials, with one visit resulting in one or more of the business's clients being photographed by a representative of San Diego County without permission, which appears to be an act of attempted intimidation.

The majority, if not all, of the Coalition members have received Cease and Desist orders, in various formats, from the County of San Diego.

32.     Defendant Gavin Newsom is the Governor of the State of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." California Constitution, Article V, § 1. Governor Newsom is named in his official capacity.

33.     Defendant  Rob Bonta is the Attorney General of the State California. Attorney General Bonta  is named in his official capacity.

34.     Defendant Mark Ghaly is the Secretary of the California Health and Human Services Director Agency. The Secretary of the California Health and Human Services Agency is responsible for overall management and control of the Health and Human Services Agency. Cal. Govt. Code § 12800 (b). Secretary Ghaly is named in his official capacity.

35.     Defendant Tomas Aragon is the Director and the State Public Health Officer of the California Department of Public Health (CDPH"). CDPH is a subdivision of the California Health and Human Services Agency. CDPH is responsible for the enforcement of California health and safety laws and regulations.  Director Aragon is named in her official Capacity.

1  36. The term "State Defendants" as used hereinafter shall refer collectively to

2 defendants Gavin Newsom,  Rob Bonta, Mark Ghaly, and Tomas Aragon.

3  37. Defendants Nora Vargas, Joel Anderson, Terra Lawson-Remer, Nathan

4 Fletcher, and Jim Desmond are members of the Board of Supervisors for San Diego County,

5 California ("Board of Supervisors"). The Board of Supervisors is the legislative and executive

6 authority for county government for San Diego County, California ("San Diego County"). As

7 such, the Board of Supervisors is the highest policy-making authority for San Diego County.

8 Defendants Nora Vargas, Joel Anderson, Terra Lawson-Remer, Nathan Fletcher, and Jim

9 Desmond are named in their official capacities.

10  38. The term "Supervisor Defendants" as used hereinafter shall refer collectively to

11 defendants Nora Vargas, Joel Anderson, Terra Lawson-Remer, Nathan Fletcher, and Jim

12 Desmond.

13  39. Defendant Wilma Wooten is the Public Health Officer for San Diego County.

14 Dr. Wooten is named in her official capacity.

15  40. The term "County Defendants" as used hereinafter shall refer collectively to the

16 Supervisor Defendants and Dr. Wilma Wooten.

17  41. Defendants Todd Gloria is the Mayor and a member of the City Council for the

18 City of San Diego, San Diego County, California; and Joe LaCava, Jennifer Campbell,

19 Stephen Whitburn, Monica Montgomery Steppe, Marni von Wilpert, Chris Cate, Raul

20 Campillo, Vivian Moreno, and Sean Elo-Rivera are members of the City Council for the for

21 the City of San Diego, San Diego county, California ("San Diego City Council"). The San

22 Diego City Council is the legislative and executive authority for city government for the City

23 of San Diego, San Diego County, California ("San Diego City"). As such, the San Diego City

24 Council is the highest policy-making authority for the San Diego City. Defendants Todd

25 Gloria, Joe LaCava, Jennifer Campbell, Stephen Whitburn, Monica Montgomery Steppe,

26 Marni von Wilpert, Chris Cate, Raul Campillo, Vivian Moreno, and Sean Elo-Rivera are

27 named in their official capacities.

28

42.     The term "San Diego City Council Defendants" as used hereinafter shall refer collectively to defendants Todd Gloria, Joe LaCava, Jennifer Campbell, Stephen Whitburn, Monica Montgomery Steppe, Marni von Wilpert, Chris Cate, Raul Campillo, Vivian Moreno, and Sean Elo-Rivera

## THE INITIAL STATE AND COUNTY HEALTH ORDERS

## IN RESPONSE TO CORNAVIRUS

43.     On or about March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency in response to the spread of COVID-19. Governor Newsom's emergency proclamation was issued pursuant to CGC Section 8625.

44.     On March 13, 2020, the Health Officer for the County of San Diego issued, in pertinent part, the following Order:

> "All public or private "large gatherings," as defined in section 11 below, are prohibited. . .This Order is issued in accordance with, and incorporates by reference: 1) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; 2) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; 3) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; 4) the Proclamation of a State of Emergency issued by Governor of the State of California on March 4, 2020; 5) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19;"

45.     On March 16, 2020, the Public Health Officer of the County of San Diego amended its March 13, 2020, Order, in pertinent part, as follows:

> "All public or private "gatherings," as defined in section 20 below, are prohibited. . . All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food, shall close. . . All restaurants and other business establishments that serve food shall close all on-site dining. All food served shall be by delivery, or through pick-up or drive thru."

46.     On March 18, 2020, the Public Health Officer of the County of San Diego amended its March 16, 2020, Order, in pertinent part, as follows:

"All gyms and fitness centers shall close."

47.     On or about March 19, 2020, Sonia Angell, who was then serving as the California State Public Health Officer, acting pursuant to the authority conferred by Governor Newsom's Orders, issued an Order which designated a list of "Essential Critical Infrastructure Workers."  The Order incorporated by reference the U.S. Government's 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. The Order provided that "Californians working in these 16 critical infrastructure sectors [would] continue their work because of the importance of these sectors to Californians' health and well-being." All other businesses and organizations were ordered either to cease all operations or to operate under substantial restrictions. Persons not employed in the 16 critical infrastructure areas were required to stay home except as necessary to obtain necessities such food, prescriptions, and healthcare.

48.     On March 19, 2020, Defendant Newsom announced that he had sent a letter to United States President Donald Trump, requesting the immediate deployment of the USNS Mercy Hospital Ship to the Port of Los Angeles through September 1, 2020, to help decompress the state's health care delivery system in Los Angeles in response to COVID-19.[1] President Trump promptly granted the request, and the hospital ship arrived in Los Angeles Harbor a few days later.

49.     On or about March 19, 2020, Sonia Angell, who was then serving as the California State Public Health Officer, acting pursuant to the authority conferred by Governor

---

[1] https://www.gov.ca.gov/2020/03/19/governor-newsom-requests-president-trump-deploy-usns-mercy-hospital-ship-to-port-of-los-angeles/

Newsom's Orders, issued an Order which designated a list of "Essential Critical Infrastructure Workers."  The Order incorporated by reference the U.S. Government's 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. The Order provided that "Californians working in these 16 critical infrastructure sectors [would] continue their work because of the importance of these sectors to Californians' health and well-being." All other businesses and organizations were ordered either to cease all operations or to operate under substantial restrictions. Persons not employed in the 16 critical infrastructure areas were required to stay home except as necessary to obtain necessities such food, prescriptions, and healthcare.

50.     On March 19, 2020, Defendant Newsom announced that he had sent a letter to United States President Donald Trump, requesting the immediate deployment of the USNS Mercy Hospital Ship to the Port of Los Angeles through September 1, 2020, to help decompress the state's health care delivery system in Los Angeles in response to COVID-19.[2] President Trump promptly granted the request, and the hospital ship arrived in Los Angeles Harbor a few days later.

51.     On March 27, 2020, the Public Health Officer of the County of San Diego, issued, in pertinent part, its Order as follows:

> "All public or private "gatherings," as defined in section 2 below, are prohibited.
>     b.   All bars, adult entertainment establishments, and other business establishments that serve alcohol and do not serve food shall be and remain closed.
>     c.   All restaurants and other business establishments that serve food shall close all on-site dining. All food served shall be by delivery, or through

_____

[2] https://www.gov.ca.gov/2020/03/19/governor-newsom-requests-president-trump-deploy-usns-mercy-hospital-ship-to-port-of-los-angeles/

1     pick-up or drive thru. Social distancing shall be required for persons
      picking up food on site.

2         d.   All gyms and fitness centers shall be and remain closed. . . .

3         e.   All persons arriving in the county from international locations identified
               on the Centers for Disease Control and Prevention (CDC) Warning Level
               2 or 3 Travel Advisory(available at: https://wwwnc.cdc.gov/travel/notices)

4              shall be subject to 14- day home quarantine, self-monitoring."

5     52.   On April 2, 2020, the Public Health Officer of the County of San Diego added

6
an addendum to its March 27, 2020, Order, in pertinent part, as follows:
7
      "Section 1 of the Health Officer Order shall be amended to add subsections o, p, q
8     and r as follows:
           o.   California Department of Public Health Face Covering Guidance issued
9               on April 1, 2020 attached hereto as Exhibit A, shall be followed in the
                county except as noted in section 1q, below. . . .
10         q.   Effective 12: 00a.m. Saturday, April 4, 2020, all employees who may
11              have contact with the public in any grocery store, pharmacy/drug store,
                convenience store, gas station, restaurant and other business establishment
12              that serves food shall wear a cloth face covering as described in the
                California Department of Public Health Face Covering Guidance referenced
13              in section 1o,  above."

14    53.   On April 3, 2020, the Public Health Officer of the County of San Diego

15
added a 2nd Addendum to its March 27, 2020, Order, in pertinent part, as follows:
16
      "Section 1 q of the Health Officer Order is amended as follows:
17         q.   All employees who may have contact with the public in any grocery
18              store, pharmacy/drug store, convenience store, gas station, restaurant,
                and other business establishment that serves food, or when making a
19              delivery to a customer, shall wear a cloth face covering as described in
                the California Department of Public Health Face Covering Guidance
20              referenced in section 1 o above. Owners of business establishments are
21              responsible for ensuring compliance with this section."

22    Section 1 of the Health Officer Order is amended to add subsections as follows:
           s.   Boating for recreational purposes, watersports, or swimming, are
23              prohibited on or in public waterways and at beaches."

24    54.   On April 8, 2020, the Public Health Officer of the County of San

25
Diego issued its Order, in pertinent part, as follows:
26
      "All persons are to remain in their homes or at their place of residence, except for
27    employees or customers travelling to and from essential businesses or activities as

28

defined in section 17a, below, or to participate in individual or family outdoor activity as allowed by this Order.

2. All public or private "gatherings," as defined in section 17b below, are prohibited.

3. All businesses not meeting the definition of essential business in section 17 are referred to in this Order as "non-essential businesses" and shall be and remain closed for the duration of this Order.

• Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029."

55.     On April 10, 2020, the Public Health Officer of the County of San Diego issued its Order, which superseded its March 27, 2020, Order, and its addendums, and restated the portions of those Orders quoted above.

56.     On April 23, 2020, the Public Health Officer of the County of San Diego issued its Order, effective April 24, 2020, which superseded its April 10, 2020, Order, and restated the portions of those Orders quoted above.

57.     On April 24, 2020, the Public Health Officer of the County of San Diego issued its Order, effective April 27, 2020, which superseded its April 23, 2020, Order, and restated the portions of those Orders quoted above.

58.     On April 30, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 1, 2020, which superseded its April 24, 2020, Order, and restated the portions of those Orders quoted above.

59.     On May 1, 2020, 31 individuals were arrested for protesting at the California State Capitol grounds against the unconstitutional California Covid restrictions.  Subsequent to the announcement that pro bono legal representation was being provided to the arrestees by the California Constitutional Rights Foundation, the charges were dropped.

**PLAINTIFF RESTAURANTS ARE REQUIRED TO CEASE**

**INDOOR AND OUTDOOR SERVICE**

60. Plaintiff Restaurants were required to cease providing indoor and outdoor dining for their customers to comply with the March 19, 2020, Order of the State Public Health Officer, and with the March 16, 2020, Order of the San Diego County Public Health Officer. Plaintiffs were permitted to offer exclusively take-out and delivery service. A prohibition on providing indoor and outdoor service to customers was catastrophic to the economic health of restaurant Plaintiffs, and to their laid off employees, as discussed above.

61. As a result of the restrictions prohibiting indoor service, restaurant Plaintiffs were forced to cancel numerous previously scheduled reservations and events.

62. As discussed above, restaurant Plaintiffs, notwithstanding their best efforts to mitigate the effect of the prohibition on indoor dining, suffered substantial reductions in revenue during the period between March 15 and May 4, 2020, and were forced to lay off numerous employees, resulting in financial hardships for the former employees, and a significant drain on the Workman's Compensation Insurance and welfare funding of the State of the California, and ultimately, costing the taxpayers substantial amounts to fund these state entities.

-------------------------------------------------------------------------------------------------------

**PLAINTIFF RESTAURANTS WERE PERMITTED TO**

**RESUME INDOOR AND OUTDOOR SERVICE AND THEN REQUIRED**

**TO CEASE INDOOR SERVICE AGAIN**

63. On May 4, 2020, Governor Newsom, again acting pursuant to emergency powers under state law, issued Executive Order N-60-20. This Order permitted businesses to begin reopening in stages, as determined by the State Public Health Officer. It also directed the State Public Health Officer to develop criteria to determine "whether and how … local health officers may … issue directives less restrictive than measures … implemented on a statewide basis pursuant to the statewide directives of the State Public Health Officer."

64. On May 7, 2020, State Public Health Officer Angell issued an Order permitting the gradual reopening of businesses and activities in California in stages. The Order provided for four stages of gradual reopening, with the final stage, Stage 4, consisting of an end to all stay-at-home orders and a full reopening of businesses.

65. Under the May 7, 2020 Order, restaurant Plaintiffs were permitted to resume providing outdoor dining service.

66. Restaurant Plaintiffs were required by defendants to implement numerous additional health and safety practices as a condition to resuming outdoor dining service under the May 7, 2020, Order. These included the development and posting of a certified compliance plan, based on criteria provided by the County of San Diego.  Compliance with these requirements imposed significant costs on restaurant Plaintiffs.

67. On May 7, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 8, 2020, which superseded its April 30, 2020, Order, and restated the portions of those Orders quoted above.  In addition, the Order provided, in pertinent part, as follows:

> "11.  All reopened businesses must prepare and post a "Safe Reopening Plan" on the form available . . . for each of their facilities in the county. The Safe Reopening Plan must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees. A copy of the Safe Reopening Plan must also be provided to each employee performing work at the facility. All reopened businesses shall implement the Safe Reopening Plan and provide evidence of its implementation to any authority enforcing this Order upon demand. The Safe Reopening Plan must ensure all required measures are implemented. If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Safe Reopening Plan to ensure proper social distancing and sanitation. Any business that fails to comply with its Safe Reopening Plan may be required to close.
>
> 12.  Effective 12:00 a.m. on May 8, 2020, each essential business and reopened business shall:
>
> > a. Require all employees to wear face coverings as described in section 9 above; and,
> > b. Shall conduct temperature screening of all employees prohibiting employees with a temperature of 100 degrees or more from entering the workplace. Symptom screening (prohibiting employees from entering if they have a cough, shortness of breath or trouble breathing or at least two of the following: fever,

chills, repeated shaking with chills, muscle pain, headache, sore throat or new loss of taste or smell) may be used only when a thermometer is not available."

68.   On May 8, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 9, 2020, which superseded its April 30, 2020, Order, and restated the portions of those Orders quoted above.

69.   On May 9, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 10, 2020, which superseded its April 30, 2020, Order, and restated the portions of those Orders quoted above.

70.   On May 15, 2020, the Mercy hospital ship left Los Angeles Harbor.  Los Angeles area hospitals did not experience a predicted surge of COVID-19 cases, and only a few dozen non-Coronavirus patients were treated on the hospital ship during its stay.[3]

71.   On May 21, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 21, 2020, which superseded its May 9, 2020, Order, and restated the portions of those Orders quoted above.

72.   On May 22, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 22, 2020, which superseded its May 21, 2020, Order, and restated the portions of those Orders quoted above.  In addition, the Order provided, in pertinent part, as follows:

"12.   All restaurants that allow dine-in services shall also be required to ensure their customers comply with all of the following measures and shall immediately close if they are not able to do so:

a.   Customers shall not stand in the restaurant except in the reception area while waiting for a table or to pick up take-out food. If customers cannot be socially distanced in the reception area they shall wait in their cars or outside of the restaurant in a line with six feet between each customer. All members of the party must be present before seating and the host must bring the entire party to the table at one time. The customers allowed at a table are limited to members of a single household or customers who have asked to be seated together at the time a table is requested.

b.   Customers shall be allowed in a restaurant only if they are dining in the

---

[3] https://www.nbclosangeles.com/news/local/navy-hospital-ship-for-non-coronavirus-patients-usns-mercy-to-leave-la/2362964/

COMPLAINT

restaurant or are picking up take-out food.
c. No food or beverages shall be served to or consumed by a customer who is not seated at a table designated by the restaurant for dining.
d. The bar area of a restaurant may be used for table service of food. Alcoholic drinks shall only be served as part of food service.
e. Customers shall wear face coverings at all times other than while at a table.
f. Tables designated for dining shall be six feet apart, or separated by barriers or partitions that extend above the heads of customers while seated. Customer shall not be allowed to bring additional chairs to the table that interfere with the six foot separation.
g. Shared entertainment items such as board games, arcade games and vending machines are prohibited and customers shall not have access to game and entertainment areas such as pool tables or darts.
h. Any customer that refuses to comply with this section shall be subject to enforcement per Health and Safety Code section 12029."

73. On May 26, 2020, the Public Health Officer of the County of San Diego issued its Order, effective May 27, 2020, which superseded its May 22, 2020, Order, and restated the portions of those Orders quoted above. In addition, the Order provided, in pertinent part, as follows:

"Effective May 27, 2020, religious services and cultural ceremonial activities may be conducted in conformance with the State Guidance pursuant to sections 11 and 12, above."

74. By May 28, 2020, hospitals across California had laid off thousands of health care professionals because the predicted surge of COVID-19 cases never came.[4] The California Hospital Association asked the state for $1 billion in aid, and another $3 billion in the new fiscal year beginning July 1, 2020 to compensate for the revenues lost by virtue of having set aside capacity for an influx of acovid-19 patients that never materialized.

75. On May 29, 2020, the Public Health Officer of the County of San Diego issued its Order, effective June 2, 2020, which superseded its May 27, 2020, Order, and restated the portions of those Orders quoted above.

76. On June 3, 2020, the Public Health Officer of the County of San Diego issued its Order, effective June 4, 2020, which superseded its May 29, 2020, Order, and restated the portions of those Orders quoted above.

---

[4] https://www.reuters.com/article/us-health-coronavirus-california-hospita/california-hospitals-struggle-financially-after-preparing-for-covid-19-surge-that-never-came-idUSKBN2341NJ

COMPLAINT

77.     On June 9, 2020, effective June 12, 2020, the State of California and the County of San Diego allowed bars without food service to reopen.

78.     On June 15, 2020, the Public Health Officer of the County of San Diego issued its Order, effective June 16, 2020, which superseded its June 8, 2020, Order, and restated the portions of those Orders quoted above. (The June 8, 2020, Order of the San Diego Public Health Officer was not found on the County's website listing of its Public Health Orders).

79.     On June 18, 2020, the Public Health Officer of the County of San Diego issued its Order, effective June 19, 2020, which superseded its June 15, 2020, Order, and restated the portions of those Orders quoted above.

80.     On June 18, 2020, the CDPH issued guidance stating that the "People in California must wear face coverings when they are in high risk situations including inside any public space."[5]  The mask mandate further instructed, "[p]ersons who are seated at a restaurant or other establishment that offers food or beverage service, while they are eating or drinking, provided that they are able to maintain a distance of at least six feet away from persons who are not members of the same household or residence."

81.     On June 29, 2020, effective June, 30, 2020, the County of San Diego barred onsite alcohol consumption at bars that did not provide dine-in food service.

82.     On June 30, 2020, effective July 1, 2020, the County of San Diego barred all dine-in food service between the hours of 10:00 PM and 5:00 AM, daily.

83.     On July 6, 2020, the Public Health Officer of the County of San Diego issued its Order, effective July 7, 2020, which superseded its June 30, 2020, Order, and restated the portions of those Orders quoted above.  In addition, the Order provided, in pertinent part, as follows:

> "13.  All brewpubs, breweries, bars and pubs shall close unless they comply with section 14c, below. All other restaurants, bars, wineries, distilleries and breweries shall close indoor service in conformance with the requirements set forth in the Guidance on Closure of Sectors in Response to COVID-19 , issued by the California Department of

---

[5] https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf

COMPLAINT

Health Services on July 1, 2020, operative in San Diego County effective immediately, and available at {https://www.cdph.ca.gov /Programs/CID/DCDC/Pages /COVID-l 9/Guidance-on-Closure of-Sectors-in-Response-to-COVID-l 9 .aspx and shall be closed from 10:00 p.m. until 5:00 a.m. every day. Guests already in the facility at 10:00 p.m. may remain in the facility until 11:00 p.m. Only staff needed to close, open or clean shall be in the facility between the hours of 11:00 p.m. and 5 :00 a.m."

84.     On July 13, 2020, the State Public Health Officer issued a further Order directing all restaurants in the State of California to again cease indoor dining service. The Order applied to all restaurants in San Diego County.  For several weeks after this date, due to temperatures hitting 95 degrees in parts of San Diego County, outdoor dining service was not feasible for many of Plaintiffs.  This order also barred indoor operations of gyms, fitness centers, bars, and other businesses.

85.     The July 6, and 13, 2020 Orders, by reinstating the prohibition on indoor dining service, substantially diminished restaurant plaintiffs' revenues and profits, and again threatened their viability as ongoing business concerns. As a result of the July 6, and 13, 2020, Orders, restaurant plaintiffs were also unable to recoup the cost of implementing the safety measures imposed by the May 7, 2020, Order as a condition to offering indoor dining to their customers.

**NEW AND MORE RESTRICTIVE REQUIREMENTS ARE IMPOSED**

86.     Effective July 15, 2020, the State of California prohibited indoor activities at the following facilities:

     a. Gyms;
     b. Fitness centers;
     c. Places of Worship;
     d. Hair salons;
     e. Barbershops;
     f. Malls; and other locations.

Given the summer heat in much of San Diego County at this time of the year, outdoor activities at many of these facilities was not practical.

87.     On July 14, 2020, the Public Health Officer of the County of San Diego issued its Order, effective July 15, 2020, which superseded its July 6, 2020, Order, and restated the portions of those Orders quoted above.  In addition, the Order provided, in pertinent part, as

follows:

"4. All restaurants, bars, wineries and breweries shall also be required to ensure their customers comply with all of the following measures and shall immediately close if they are not able to do so:

a.  No food or beverages shall be served to or consumed by a customer who is not seated at a table designated by the restaurant for dining.

b.  The bar area of a restaurant may be used only for table service of meals.

c.  Alcoholic drinks shall only be served as part of a meal and must be sold and served in the same transaction as the meal. All meals shall be served by a food operator permitted by the San Diego County Department of Environmental Health. This restriction shall not be applicable to outdoor service of wine at a winery or spirits at a distillery.

d.  Customers shall not stand in the restaurant, bar, winery, distillery or brewery except in the reception area while waiting for a table or to pick up take-out food. If customers cannot be socially distanced in the reception area they shall wait in their cars or outside of the restaurant in a line with six feet between each customer.

e.  Discontinue open seating. All members of the party must be present before seating and the host must bring the entire party to the table at one time. The customers allowed at a table are limited to members of a single household or customers who have asked to be seated together at the time a table is requested.

f.  Discontinue seating customers and/or groups at bar counters, sushi preparation bars, etc. where they cannot maintain at least six feet of distance from employee work areas/stations. Install physical barriers or partitions in areas where maintaining a physical distance of six feet is difficult.

g.  Customers are not required to wear face coverings while at a table with members of the same household. Customers at a table with non-household members are not required to wear face coverings when eating and drinking. Customers are required to wear face coverings at all other times in conformance with paragraph 9, above.

h.  Tables designated for dining shall be six feet apart, or separated by barriers or partitions that extend above the heads of customers while seated. Customer shall not be allowed to bring additional chairs to the table that interfere with the six foot separation.

i. Self-serve food or drink options, such as buffets, salad bars, and drink stations are not allowed.

j.  Shared entertainment items such as board games, arcade games and vending machines are prohibited and customers shall not have access to game and entertainment areas such as pool tables or darts.

k.  Dance floors shall be closed and live performances such as musical or dance acts shall be discontinued.

l.  Any customer that refuses to comply with this section shall be subject to enforcement per Health and Safety Code section 120295."

88.     On July 20, 2020, the Public Health Officer of the County of San Diego issued its Order, effective July 21, 2020, which superseded its July 14, 2020, Order, and restated the

portions of those Orders quoted above.

89.     On July 29, 2020, the Public Health Officer of the County of San Diego issued its Order, effective July 30, 2020, which superseded its July 20, 2020, Order, and restated the portions of those Orders quoted above.

90.     On August 7, 2020, the Public Health Officer of the County of San Diego issued its Order, effective August 8, 2020, which superseded its July 29, 2020, Order, and restated the portions of those Orders quoted above.

91.     On August 21, 2020, the Public Health Officer of the County of San Diego issued its Order, effective August 22, 2020, which superseded its August 7, 2020, Order, and restated the portions of those Orders quoted above.

92.     On August 28, 2020, Erica Pan, who was then the Acting State Public Health Officer, implemented a statewide Order that abandoned the previous, staged re-opening plan promulgated in the May 7, 2020 Order.   The August 28, 2020 Order remains in effect at the time of the filing of the Complaint with a September 30, 2020 modification to include an "equity" component. The August 28, 2020 Order dictated that counties would be classified according to a new plan entitled "Blueprint for a Safer Economy," under which a color-coded "tier" system would be used.  Under this system, each county is placed in one of four tiers, Purple, Red, Orange, and Yellow, ranging from most to least restrictive.  Unlike the previous staged reopening plan under the May 7, 2020, Order, the current "tier" system under the August 28, 2020, Order does not provide any criteria under which California's businesses and economy would be permitted to fully reopen.  Under the August 28, 2020, Order, under the respective tiers, restaurants are required to 1.) cease all indoor dining (Purple tier); 2.) limit indoor dining capacity to 25% (Red tier); or 3.) limit indoor dining capacity to 50 % (Orange and Yellow tiers).  Further, pursuant to the "Blueprint," under the "purple tier," gyms could

provide only outdoor activities (impractical, or even dangerous, in certain parts of the County, during the summer heat and/or the winter rain/snow/cold); bars not serving food are closed; offices can only have remote workers; hair salons/barbershops are open, subject to "modifications"; and churches can only have outdoor services.  Additionally, pursuant to the "Blueprint," under the "red tier," gyms could provide outdoor and some indoor activities (up to 10% of capacity indoors); bars not serving food remained closed; offices can only have remote workers; churches can have indoor services (only to 25% of capacity, despite a recent United States Supreme Court ruling barring such restrictions); and hair salons/barbershops can provide indoor services, subject to "modifications."

93.     For counties with populations of 106,000 or greater, which includes San Diego County, the September 30, 2020, equity component incorporated into the Augusts 28, 2020, Order imposes as a condition of moving to a less restrictive tier a requirement that the test positivity rates in the most disadvantaged neighborhoods do not significantly lag behind the overall county test positivity rate.[6] It further requires all counties, as condition to moving to a lower tier, to submit a plan that (1) defines its disproportionately impacted populations, (2) specifies the percent of its COVID-19 cases in these populations, and (3) shows that it plans to invest Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases grant funds at least at that percentage to interrupt disease transmission in these populations.[7]

94.     Defendant Newsom has indicated his intent to implement these tiered restrictions for an indefinite period of time, publicly stating that "This Blueprint is statewide,

---

[6] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CaliforniaHealthEquityMetric.aspx (November 10, 2020).

[7] *Id.*

stringent and slow….We have made notable progress over recent weeks, but the disease is still too widespread across the state. COVID-19 will be with us for a long time and we all need to adapt. We need to live differently. And we need to minimize exposure for our health, for our families and for our communities." The current statewide Orders therefore include no provision for fully reopening the economy and by their terms continue for an indefinite period into the future.

95.     On August 31, 2020, the Public Health Officer of the County of San Diego issued its Order, effective September 1, 2020, which superseded its August 7, 2020, Order, and restated the portions of those Orders quoted above.  In addition, the Order provided, in pertinent part, as follows:

"11.  REOPENED BUSINESS
a.  "Reopened business" is a business that is not an essential business as defined in section 10a above, and has reopened in conformance with the State of California's Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe (available at https://www.cdph.ca.gov /Programs/CID/DCDC/Pages/COVIDl 9/COVID l 9CountyMonitoringOverview .aspx Statewide Public Health Officer Order, issued by the California Department of Health Services on August 28, 2020, all portions of which are operative in San Diego County effective immediately, and available at { https ://www.cdph .ca.gov /Programs /C1D/DCDC /CDPH%20Document%20Library /COVIDl 9/8-28-20 Order-Plan-Reducing-COVID 19-Adjusting-Permitted-Sectors-Signed.pdf}. A reopened business may open when the Public Health Officer has posted an acknowledgement of the reopened status on the County of San Diego Coronavirus website and the business has complied with the requirements of this Order.
b.  The State of California's Blueprint for a Safer Economy establishes a four tier system for reopening business sectors. Those business sectors listed in the "Substantial/Tier2" column of the Activities and Business Tiers chart are allowed to reopen under the conditions set forth in the chart.
        i. Every business in the following sectors listed in the Activities and Business Tiers shall require all customers who receive services indoors or use indoor facilities to sign in with their name and telephone number:
                1. Hair Salon s & Barbershops
                2. Personal Care Services
                3. Gyms & Fitness Centers
                4. Restaurants, Wineries, Bars, Breweries, and Distilleries (where meal is provided) as required in section g below…
g.  All restaurants, bars, wineries, distilleries and breweries which are allowed to

provide indoor service pursuant to the State of California Dine-in Restaurant Guidance shall comply with the following additional requirements applicable only to persons dining indoors : . . .

    ii.  The restaurant shall obtain the name of each guest seated at a table and the telephone number of at least one guest and shall maintain the list of names and telephone numbers for three weeks. . . .

    iii.  Guests will be required to wear face coverings at all times while in the facility, including when seated at a table before the meal is served and after the meal is finished."

96.    On September 9, 2020, the Public Health Officer of the County of San Diego issued its Order, effective September 10, 2020, which superseded its August 31, 2020, Order, and restated the portions of those Orders quoted above.

97.    On September 25, 2020, the Public Health Officer of the County of San Diego issued its Order, effective September 25, 2020, which superseded its September 9, 2020, Order, and restated the portions of those Orders quoted above.

98.    On October 9, 2020, the Public Health Officer of the County of San Diego issued its Order, effective October 10, 2020, which superseded its September 29, 2020, Order (the September 29, 2020, Order of the San Diego County Public Health Officer was not found on the County's website listing of its Public Health Orders), and restated the portions of those Orders quoted above.

99.    On October 20, 2020, the CDPH issued: COVID-19 INDUSTRY GUIDANCE: Shopping Malls, Destination Shopping Centers, and Swap Meets.  The Guidance instructs, "[e]nsure workers can maintain physical distance in breakrooms, using barriers, increasing distance between tables/chairs to separate workers, etc.  . . .  Discourage workers from congregating during breaks and ensure they are not eating or drinking without face coverings within six feet of each other."  Thus, the Guidance allows indoor eating and drinking for these industries.

100.    On November 2, 2020, the Public Health Officer of the County of San Diego

issued its Order, effective November 3, 2020, which superseded its October 9, 2020, Order, and restated the portions of those Orders quoted above.

101. On November 6, 2020, Defendant Newsom was photographed at the upscale restaurant, The French Laundry, in the presence of several people not practicing social distancing, nor wearing a mask, including while not seated.[8] Defendant Newsom later admitted, "I made a mistake."  Although the violations of the mask mandate of June 18, 2020, took place at The French Laundry, Plaintiffs have not located any reports of investigations by ABC of violations of CGC § 8665 at the French Laundry restaurant.

102. On November 13, 2020, the Public Health Officer of the County of San Diego issued its Order, effective November 14, 2020, which superseded its October 9, 2020, Order, and restated the portions of those Orders quoted above, except that "Gyms & Fitness Centers and Restaurants, Wineries, Bars, Breweries, and Distilleries were no longer required to have sign in procedures. . ."

103. On November 19, 2020, the Erica Pan, who was then acting as the State Public Health Officer, issued a Limited Stay at Home Order that directed residents in counties in the Widespread (Purple) tier, to stop non-essential activities between 10 p.m. and 5 a.m.

104. On November, 20, 2020, effective November 21, 2020, the County of San Diego closed all restaurants, bars, wineries, distilleries, and breweries from 10:00 PM until 5:00 AM, daily, except for delivery, take-out, and drive-thru's.

105. On December 3, 2020, effective December 5, 2020, the State of California issued its REGIONAL STAY AT HOME Order.  The Order provided, in pertinent part, as follows:

---

[8] https://www.foxla.com/news/fox-11-obtains-exclusive-photos-of-gov-newsom-at-french-restaurant-allegedly-not-following-covid-19-protocols

" All individuals living in the Region shall stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure,[1] as required by law, or as specifically permitted in this order."

106.    On December 4, 2020, Los Angeles are restaurant owner Angela Marsden reported that she was ordered to close her outdoor dining space while, less than 100 feet away, similar outdoor dining space was allowed to serve food for a film crew.  Angela Marsden questioned the unequal treatment.  The unequal treatment of small restaurants and large film studios was widely reported.[9]

107.    On December 5, 2020, effective December 6, 2020, at midnight, the County of San Diego ordered closed the following:

- Restaurant Food Facilities (other than for take-out, pick-up or delivery, which is still allowed)
- Bars, breweries, and distilleries (other than for pick-up, which is still allowed)
- Wineries
- Indoor and outdoor playgrounds
- Indoor recreational facilities
- Hair salons and barbershops
- Personal care services (including massage and body art)
- Museums, zoos, and aquariums
- Movie theaters
- Family entertainment centers
- Cardrooms and satellite wagering
- Limited services
- Live audience sports
- Amusement parks

108.    On December 6, 2020, Erica Pan, who was then acting as the State Public Health Officer, issued a supplemental order increasing the operation of grocery stores to 35% of capacity and presenting clarifications to the Regional Stay at Home Order.

109.    On December 8, 2020, Secretary Ghaly, in an interview, admitted that there was no medical reason for barring outdoor dining, but that the order was issued to

---

[9] https://www.nytimes.com/2020/12/05/us/outdoor-dining-la-protest.html

force people to stay at home.[10]

110.    According to a number of public reports, numerous outbreaks have been caused by gatherings at home.

111.    On December 9, 2020, the Public Health Officer of the County of San Diego issued its Order, effective December 10, 2020, which superseded its December 5, 2020, Order, and restated the portions of those Orders quoted above.

112.    On December 14, 2020, Defendant Newsom announced the arrival of COVID-19 vaccine in California, and the administration of the first doses.[11]   No mandatory vaccination requirements were announced.

113.    On December 18, 2020, the County of San Diego, as a result of the California State Fourth District Court of Appeal overturning a San Diego County Superior Court Order re-opening all restaurants and strip clubs in San Diego County, ordered that all onsite dining (indoor and outdoor) be prohibited and that the State and local health orders and food facility protocols must be followed.  All food facilities, including restaurants, bars, breweries, wineries and distilleries, were to only offer food and beverage for take-out, pick-up, or delivery.

114.    On December 18, 2020, Defendant Newsom attempted to explain ICU capacity in a video, stating: "when you see 0%, that doesn't mean there's no capacity, no one's allowed into an ICU.  It means we're now in our surge phase, which is about 20% additional capacity that we can make available through the ICU system.  I don't want people to be alarmed by that, except I do want to raise the alarm bell about what we all must do individually and collectively to address this rate of growth,".[12]

---

[10] https://www.youtube.com/watch?v=ydrEN5zSS-s
[11] https://www.gov.ca.gov/2020/12/14/governor-newsom-launches-vaccinate-all-58-campaign-based-on-safety-and-equity-as-first-vaccines-arrive-to-california/
[12] https://www.pe.com/2020/12/18/what-public-health-leaders-mean-by-0-icu-beds-

115. In response to media inquiries about how ICU bed availability could be at zero percent when hospitals are reporting that beds are available, CDPH responded with an algorithm used to adjust actual ICU capacities measures for each of the five regions.[13]  "If a region [in California] is utilizing more than 30% of its ICU beds for COVID-19 positive patients, then its available ICU capacity is adjusted downward by 0.5% for each 1% over the 30% threshold," according to CDPH.  Secretary Ghaly reportedly stated, "When we have seen hospitals with ICU capacity used up for COVID above 30% we consider … that region's ICU capacity really ill-prepared to serve and support individuals with other sorts of urgent and emergent needs, like heart attacks, strokes, other trauma."[14]

116.   On December 28, 2020, California Alcohol and Beverage Control (ABC) issued a press release stating that its agents " will check on compliance with alcoholic beverage laws and statewide health orders to help stop the spread of COVID–19."[15]  No explanation has been forthcoming from the State as to the statutory and/or case law basis for the claimed power of the ABC to enforce "health orders."

117.   On January 6, 2021,  CDPH issued a Travel Advisory stating, "[e]xcept in connection with essential travel, Californians should avoid non-essential travel to any part of California more than 120 miles from one's place of residence, or to other states or countries," and "non-essential travelers from other states or countries are strongly discouraged from

---

available/amp/ and https://abc7.com/california-icu-capacity-by-region-bay-area-covid-gov-newsom-update-beds/8879527/ at 00:55.
[13] https://www.bakersfield.com/ap/national/how-can-california-have-0-icu-capacity-and-1-300-available-icu-beds/article_4488fd1d-0ce0-500e-9464-17ab1cc06fd1.html and https://katv.com/news/nation-world/what-you-need-to-know-about-icu-capacity-in-the-united-states
[14] https://www.mercurynews.com/2020/12/29/how-can-california-have-0-icu-capacity-and-1300-available-icu-beds/
[15] https://www.abc.ca.gov/abc-agents-will-be-out-during-the-new-years-holiday-weekend-to-increase-safety/

entering California."  The Advisory further states, "[a]ll persons arriving in or returning to California from other states or countries, should self-quarantine for 10 days after arrival, except as necessary to meet urgent critical healthcare staffing needs or to otherwise engage in emergency response.."[16]  This "Advisory," at least arguably, restrains individuals from traveling to and from California, as well as within.

118.    On about January 12, 2021, it was reported that a spokesman for Defendant Newsom stated that Defendant Newsom is not planning to require the hundreds of thousands of state workers to get vaccinated.[17]

119.    On January 25, 2021, the State of California lifted its REGIONAL STAY AT HOME ORDER.  As a result, San Diego County was placed in the State's most restrictive (purple) tier. Pursuant to placement in the purple tier, the County of San Diego, on January 25, 2021, enacted a chart of allowable operations with modifications in the Purple Tier which include:

- Restaurant outdoor dining, drive-thru, take-out, pick-up, and delivery
- Wineries outdoor service, take out, pick up, and delivery
- Indoor services at body art facilities and massage establishments
- Live entertainment is permitted in outdoor dining settings

The County also provided that bars, breweries, and distilleries shall remain closed where no meal is provided (except for take-out, pick-up, and delivery, which is still allowed). If providing a meal, bars, breweries and distilleries were to follow the restaurant guidance for outdoor dining.

120.    On January 28, 2021, the County of San Diego ordered that all restaurants, bars, wineries, distilleries and breweries shall be closed from 10:00 p.m., until 5:00 a.m., every day, except for delivery, take-out, pick-up, and drive-thru service. Guests already dining outdoors at 10:00 p.m. were allowed to remain until 11:00 p.m., and that

---

[16] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Travel-Advisory.aspx
[17] https://www.sacbee.com/news/coronavirus/article248433240.html

all indoor dining continued to be prohibited.

121.    Despite the State of California's lifting of its REGIONAL STAY AT HOME ORDER, the County of San Diego, in its February 6, 2021, Order, stated:

> "All persons are to remain in their homes or at their place of residence, except for employees or customers traveling to and from essential businesses or a State authorized sector as defined in sections 10 and 11, below, or to participate in individual or family outdoor activity as allowed by this Order."

This Order remains currently in effect.

122.    As of March  27, 2021, the State reported that  17,136,841 doses of the COVID-10 vaccine had been administered across the state, and that 1,627828 doses had been administered in San Diego County. [18]

123.    The restrictions in place by virtue of the Orders, Proclamations and Resolutions of the County Defendants and their employees and agents, as alleged above, imposed restrictions on plaintiffs that were, and continue to be, at least as restrictive as those imposed by the Orders and restrictions implemented by the State Defendants.

124.    The Orders, Proclamations and Resolutions implemented by the County Defendants and their agents and employees as alleged above were issued on the authority of the Supervisor Defendants and were the official policy of San Diego County.

125.    Plaintiffs and other restaurant owners are well-versed in appropriate practices to prevent the spread of contagion and illnesses within a restaurant setting. Implementing appropriate sanitary and hygiene practices and to ensure customer safety is an everyday practice in the restaurant business.

126.    Restaurants in San Diego County are also subject to regular mandatory health and safety inspections by both state and local health officials.

## SAN DIEGO COUNTY IRRATIONALLY
## DISCRIMINATED AGAINST PLAINTIFFS IN THE ENFORCEMENT
## OF HEALTH MEASURES AND USED STATE ACTION TO RETALIATE
## AGAINST AND SILENCE PLAINTIFFS' PROTECTED EXPRESSIVE ACTIVITY

[18] https://covid19.ca.gov/vaccines/#California-vaccines-dashboard

127.   Rather than working with restaurant Plaintiffs to allow them to resume their full scope of business activities and exercise their fundamental right to pursue a lawful vocation, the County Defendants intentionally treated plaintiffs differently than other, similarly situated, restaurant businesses without any rational basis. The County Defendants have also retaliated against plaintiffs for exercising their First Amendment rights to free speech and association and to seek a redress of grievances. The San Diego County defendants have thereby attempted to silence plaintiff's legitimate expressive activities.

128.   Virtually all of the Plaintiffs have been served with "Cease and Desist" orders, requiring immediate closure and threatening the imposition of fines, citing an "imminent and substantial health hazard." However, no specific finding was provided substantiating the existence of an imminent and substantial health hazard. The closure orders were arbitrary and capricious and violated these plaintiffs' due process rights under the Fourteenth Amendment. Curiously enough, several plaintiffs were served with such orders, and/or with "Notices of Violation" by the ABC, with a few days after being interviewed by local media, expressing their concerns about the unconstitutionality of the orders, and, in some cases, stating that their business would be remaining open.

129.   For example, Plaintiff Pine Valley House is in the middle of the Cleveland National Forest in the local mountains at a 4000' elevation.  Each year, from November 1 to Memorial Day weekend, Plaintiff regularly experiences temperatures in the 20's, and, commonly, in the teens. Plaintiff experiences snow, 50-100 mph winds, frost, and ice.  There is NO scenario where outside dining is an option for Plaintiff during this time of the year. Plaintiff "sets up" the outdoor area for the summer season. Setting the area up, and taking it down, back & forth, for the intermittent days when there might be 3-5 daytime hours warm enough to serve outside is logistically infeasible and too costly at a time when Plaintiff's revenues are down more than 50%.  Thus, while outdoor activities may be feasible for certain restaurants, bars, gyms, martial arts studios, hair salons, dance studios, and/or other businesses

in San Diego County, on the coast, during the warm times of the year, when it is not raining or snowing, or freezing, it is not feasible for many such businesses inland, in the mountains, during the fall, winter, and even spring.  As a result, competitors of plaintiffs are benefitted by the unconstitutional Covid restrictions, while plaintiffs are being punished.

130.    For each Plaintiff in this litigation, there are dozens, if not hundreds, of similar businesses, operating freely, without government interference, in San Diego County.  Many of plaintiffs have received criminal and/or administrative citations, Alcohol, Beverage & Control Accusations, and/or other notification that governmental action being taken, and/or is being contemplated, against them for having the temerity to stand up and say that, for the benefit of their families, their employees, and the community at large, they will not accede to the unconstitutional Covid restrictions being enforced against them by the State of California, the County of San Diego, and the City of San Diego.  Plaintiffs' freedom of speech, their right to assemble and protest, and their right to petition for redress of grievances are all being attacked by the actions of these governmental entities.

**PLAINTIFFS WILL CONTINUE TO SUFFER SIGNIFICANT HARM FROM IMPLEMENTATION AND ENFORCEMENT OF COVID-19-RELATED ORDERS**

131.    After the implementation of the August 28, 2020, Order of the State Public Health Officer, Plaintiff restaurants were able to serve sit down patrons at only 25% of indoor capacity and at outdoor tables.  As discussed above, these restrictions have been changed numerous times by the State of California, and the County of San Diego, with the result that it has been difficult for all plaintiffs to understand what they can do, and where, to serve their clients.

132.    Many of plaintiffs' businesses border busy main streets in San Diego County, for the logical reason that such placement make them easier for their clients to find.  Requiring

these plaintiffs to serve customers outdoors has exposed their customers and employees to various hazards, including motor vehicle traffic, exhaust fumes, noise, ambient heat, rain, sleet, frost and snow. These hazards have diminished the volume of business of these plaintiffs.

133.    San Diego County is in its Winter Season, in which parts of it experiences regular rain and snowstorms, as well as low temperatures during both day and night. These seasonal weather conditions prevent many Plaintiffs from continuing to be able to serve their customers outdoors. Should such Plaintiffs be unable to resume indoor service at full capacity, they will soon cease to be viable economic business enterprises, with resulting damage to such Plaintiffs, as well as to their employees.

## CALIFORNIA LAW REQUIRES THE TERMINATION OF THE
## STATE OF EMERGENCY

134.    The need for the combined forces of mutual aid regions to combat the COVID-19 pandemic is over, and the unconstitutional orders pursuant to the State of Emergency, imposed by California State Governor Newsom and his Administration should be terminated.

135.    CGC § 8558 of the California Emergency Services Act, by rambling language in paragraph (b), defines a "State of emergency," in pertinent part, as follows:

"'State of emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by conditions such as . . . epidemic, . . . or other conditions, . . . which, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat . . . ."[19]

Thus, a necessary element of a "State of emergency" is that the epidemic be of a

---

[19] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=GOV&sectionNum=8558.

magnitude to "require the combined forces of a mutual aid region or regions." Mutual aid regions are authorized under CGC § 8600, and a mutual aid agreement among regions need not be authorized under CGC § 8600.  See, e.g., Article 11 Mutual Aid (CGC § 8615 - 8619.5)[20]

CGC § 8629 states, "The Governor shall proclaim the termination of a state of emergency at the earliest possible date that conditions warrant. All of the powers granted the Governor by this chapter with respect to a state of emergency shall terminate when the state of emergency has been terminated by proclamation of the Governor or by concurrent resolution of the Legislature declaring it at an end."[21] The Regional Stay Home Order was lifted on January 25, 2021, along with the Limited Stay Home Order.  The Hospital Surge Order was ended on February 5, 2021.[22] When lifting the Regional Stay Home Order, Governor Newsom made the following remarks regarding ICU capacity, "So you can take a look here at the regions, these being the five regions in the state. Our projection statewide is in the aggregate being at 30.3% on the 21st of February. They're, again, variables that are constantly changing, but these are the projections. You can see in Southern California it would exceed even that state rate." [23]

136.    After the Regional Stay Home Order was lifted, the State reverted to the Blueprint for a Safer Economy, which is a tiered approach by county, not by region.[24]

---

[20] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=GOV&sectionNum=8600.
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=1.&title=2.&part=&chapter=7.&article=11.

[21] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=GOV&sectionNum=8629.

[22] https://covid19.ca.gov/stay-home-except-for-essential-needs/

[23] From the transcript of Governor Newsom California COVID-19 Update: January 25, 2020 at 09:09.
https://www.rev.com/blog/transcripts/california-gov-gavin-newsom-covid-19-press-conference-transcript-january-25-lifts-lockdown
https://www.youtube.com/watch?v=O0MRjtslGXU&feature=youtu.be

[24] https://covid19.ca.gov/safer-economy/

California law requires termination of the state of emergency "at the earliest possible date."  According to the actions and the statements of Governor Newsom, the conditions for the "Statement of emergency" no longer exist, namely, the magnitude of the epidemic has dropped to a level that no longer requires "the combined forces of a mutual aid region or regions to combat" it.

137.    The graphs tracking COVID-19 show that the virus has run its course.[25] There were 3,555,915 confirmed cases (infections) in California of COVID-19 as of March  26, 2021, most occurring during the recent surge in November, December, and into January, 2021.  Countless other infections were never tested/lab confirmed.  Since the middle of January, positive cases have dropped to 25% of the January peak.  Recently, the State government has talked about a "post-Super Bowl surge", "more infectious" mutations, scarce vaccines, etc.  Like the carrot on a stick in front of the donkey, it seems that the State government will never be able to reach a point where they deem that the conditions warrant termination of the State of Emergency.  In reality, the California State government was unable to prevent the spread of the virus to much of the population.  As a result, the risk of another surge seems unlikely, and "the combined forces of a mutual aid region or regions to combat" it are no longer required.

### FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983-Fourteenth Amendment Substantive Due Process)

138.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

139.    The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary wrongful, state action regardless of the fairness of the procedures employed. *Zinerman v. Bosch*, 494 U.S. 113, 125 (1990).

---

[25] https://covid19.ca.gov/state-dashboard/

140.    The right of citizens to support themselves by engaging in a chosen lawful occupation or business is deeply rooted in our nation's legal and cultural history, and has long been recognized as a component of the liberty and property interests protected by the Fourteenth Amendment. *Truax v. Raich*, 239 U.S. 33, 41 (1915); *Piecknick v. Comm of Pa.*, 36 F.3d 1250, 1259 (3d Cir. 1994) (citing *Green v. McElroy*, 360 U.S 474, 492 (1959); *Truax*, 239 U.S. at 41); *Medina v. Rudman*, 545 F.2d 244, 250 (1st Cir. 1976). *See also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

141.    The Fourteenth Amendment also prohibits government action that arbitrarily infringes the fundamental liberty interest of citizens to travel, be out and about in public, associate, and simply be left alone while otherwise acting in a lawful manner. *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999); *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964); *Kent v. Dulles*, 357 U.S. 116, 126 (1958) (right to travel includes interstate and intrastate travel) ; *Lutz v. City of York*, 899 F.2d 255, 268 (3d Cir. 1990); *See also Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

142.    The substantive due process component of the Fourteenth Amendment forbids the government from infringing upon fundamental liberty interests regardless of the process provided unless the infringement survives review under strict scrutiny. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

143.    The Orders and restrictions at issue in this matter cannot be sustained even under the less-exacting standard that the state action in question must be narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993).

144.    The United States Supreme Court has declared that "even in a pandemic, the Constitution cannot be put away and forgotten."  See, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. ____ , 14 S.Ct. 63, 68 (2020)(per curiam).  States and local jurisdictions have interpreted the 115 year old decision in *Jacobson v. Massachusetts*, 197 U. S. 11 (1905),

and its progeny, as a license to violate constitutional rights of individuals and businesses under a state's police powers.  The *Jacobson* decision involved the mandatory vaccination of an individual against the smallpox disease.

145.    The smallpox disease has been described as "the most dreadful scourge of the human species."  The smallpox disease killed 3 out of every 10 people infected with the disease.[26] Many smallpox survivors were left with permanent scars over large areas of their body, especially their faces.  Some were left blind.

146.    By 1905, the medical community had over 100 years of experience with the smallpox vaccine.  The lesion/blister that forms at the vaccination site heals within a few weeks without significant impact on the recipients ability to earn a living, visit family and friend, dine at a restaurant, go to a gym, or other normal pursuits of property and happiness. As with any vaccine, severe side effects may occur, but are rare.  We vigorously assert that the current COVID-19 pandemic is not even remotely comparable to the scourge of the smallpox disease, and the *Jacobson* decision does not shield the Defendants from liability.

147.    Further, the holding of the *Jacobson* decision is for mandatory vaccination, and its application should be limited to cases where a state has mandated vaccination.  The Defendants have not mandated vaccinations, and have not indicated having any plans to mandate vaccination.  We vigorously assert that the Defendants, by their failure to mandate vaccinations, have voluntarily removed themselves for the deference afforded by the holding the Jacobson decision.

148.    Further, the holding of the Jacobson decision is for mandatory vaccination, and its application should be limited to cases where a state has mandated vaccination.  The Defendants have not mandated vaccinations, and have not indicated having any plans to mandate vaccination.  We vigorously assert that the Defendants, by their failure to mandate vaccinations, have voluntarily removed themselves for the deference afforded by the holding the Jacobson decision.

---

[26] https://www.cdc.gov/smallpox/history/history.html

149.    The imposition of lockdowns requiring vast segments of the population to remain at home regardless of their status as a carrier of disease is on its face arbitrary and not narrowly tailored to serve a compelling public interest. Remarkably, despite multiple changes in the Orders, the State Public Health Officer's stay-at-home order of March 19, 2020, remains in effect as of the filing of this Complaint through the County of San Diego's February 6, 2021, order. Such broad-ranging and sweeping measures have never been previously employed to prevent the spread of disease. Mitigation efforts in response to the Spanish Flu pandemic—the most deadly pandemic in American history—did not come close to imposing restrictions comparable to the lockdown orders, business closures, and restrictions imposed and enforced by defendants.  Although this nation has been faced with many epidemics and pandemics, governments have never responded with lockdowns of entire populations and/or shutdowns of significant sectors of the economy for extended and indefinite periods, such as we have been, and are, facing today.

150.    Neither general lockdown measures, wide-ranging business closures, nor prohibitions on public gatherings can be justified as quarantines. Quarantine orders may be permitted as to infected individuals, but not the public at large. *Robinson v. State of California*, 370 U.S. 660, 666 (1962). "Before exercising their full powers to quarantine, state official must show that 'reasonable ground exists to support the belief" that the person so held is infected. *In re Martin*, 83 Cal.App.2d 164, 167 (1948) (citation and internal quotes omitted). Public health officials must be able to show "probable cause to believe the person so held has an infectious disease …" *Id*. California courts have found that "a mere suspicion [of a contagious disease], unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all for depriving persons of their liberty and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex parte Arata*, 52 Cal. App. 380, 383 (1921). The lockdowns and business closures, and the public gathering provisions of the Orders at issue apply broadly to persons, businesses, and lawful gatherings without any specific showing of infection and/or of the probability of transmission.

151.    Evidence and analysis available since at least May, 2020, further establishes that the state actions at issue in this matter—widespread population lockdowns, widespread business closures and restrictions, and pervasive restrictions on the right of the people to travel, associate, and assemble to pursue lawful spiritual, political, economic, and social ends—cannot be justified as rationally necessary to protect public health.

152.    At a press conference on March 19, 2020, defendant Newsom repeatedly said the rationale for the March 19, 2020, Order was to "bend the curve" to slow down transmission of COVID-19 enough to reduce the strain of an expected, large influx of COVID-19 cases was anticipated to produce.[27]  Newsom predicted a 20 percent hospitalization rate and 56 percent infection rate in California.  Had these predictions proven accurate, California would have experienced 25.5 million infections, over 5 million total hospitalizations, nearly 100,000 simultaneous hospitalizations, and a shortfall of 9,336 hospital beds.[28]

153.    While the March 19, 2020, Order was arguably reasonable as a short term measure, taken with limited information, epidemiological evidence has long since demonstrated that there is no rational basis for believing that the sweeping restrictions still in place are necessary to achieve the goal of "bending the curve," or combating COVID-19.

154.    As of May 5, 2020, within seven weeks after Newsom's announcement, the California Department of Public Health reported the total number of confirmed cases requiring hospitalization—including ICU treatment—was 4,474.[29] As of May 5, 2020, according to the California Department of Public Health, the total number of suspected COVID-19 cases requiring hospitalization, including ICU treatment, was 1,622.[30] Adding these together yields a total of 6,096 patients requiring hospitalization statewide.

---

[27] The March 19, 2020 press briefing is available at: https://www.youtube.com/watch?v=8OeyeK8-S5o (November 10, 2020). (*See also* 3/19/20 EO-N-33-20 and Order of the State Public Health Officer.)

[28] *Id.*

[29] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (May 7, 2020).

[30] *Id.*

155.    Current hospitalizations, and ICU usage attributable to COVID-19 demonstrate that the need to "bend the curve" has not re-emerged. According to data provided by the California Department of Public Health, as of March 10, 2021, there were 4,205 hospitalizations and 1,107 patient in ICU units with confirmed cases of COVID-19 in California. and 364 hospitalizations and 114 patients in ICU units in San Diego County with confirmed cases of COVID-19.[31]

156.    Without minimizing the impact of these cases on the infected individuals, their families and the community, these numbers are not even in the general vicinity of the predictions that Governor Newsom relied upon in issuing the March 19, 2020, Order. As of March 10, 2021, almost a year later, there have 3,513,678 confirmed cases of Covid, and, while this is a large number, it is less than 14% of what Governor Newsom predicted.

157.    The factual predicates for the March 19, 2020, Order have proven inaccurate by orders of magnitude. California did not use the hospital ship provided by the United States Navy in response to Governor Newsom's March 4, 2020, letter to President Trump. There has been no shortfall of hospital beds, ICU units, or ventilators. No COVID-19 patient in California has been denied needed medical attention because the health care system was overtaxed.

158.    As early as April 16, 2020, Governor Newsom himself stated that the goal of "bending," and, arguably, flattening the curve had been achieved.[32]

159.    The grossly exaggerated predictions relied on by Governor Newsom in issuing the Orders and restrictions at issue appear to have been based on extremely high effective rates of transmission reported in Wuhan, China, when the virus first emerged.

---

[31] COVID map: California reported 4,890 new cases, 168 new deaths and 23 fewer hospitalizations (mercurynews.com)

[32] https://www.rev.com/blog/transcripts/gov-gavin-newsom-california-covid-19-briefing-transcript-april-16 (November 10, 2020).

160.    In addition, a number of studies of antibody tests, conducted as early as April, 2020, have concluded that the virus has spread through the population far more widely than is indicated by positive test results. While none of these studies is conclusive, they have been consistent in concluding that the virus has spread through the population at rates from ten to fifty times greater than the incidence of infection derived from positive test results. Higher overall rates of transmission means that negative outcomes from COVID-19 -hospitalizations, ICU use, and deaths are far less frequent as a percentage of total infections than indicated by calculating the rate of these outcomes as a percentage of positive test results.

161.    Effective lowering of the transmission and lethality of the virus can be achieved by less restrictive means that are narrowly tailored to the risks presented by COVID-19. Eight in ten deaths from COVID-19 occurred to those age 65 or older, and of those deaths, more than 50% were 85 or older.[33] Those suffering from preexisting conditions, such as diabetes, hypertension, and heart disease also face grossly disproportionate risks from COVID-19. Measures to protect vulnerable populations combined with appropriate hygiene measures are sufficient to combat the spread and negative outcomes of COVID-19. This is demonstrated by the COVID-19 outcomes achieved in Taiwan and Sweden without implementing sweeping lockdown measures and business closures and restrictions.

162.    The wide-ranging restrictions at issue, imposed for extended and indefinite periods, are not only not narrowly tailored to serve the purpose of promoting public health, they are also deleterious to public health. The irrationality and negative health outcomes associated with the restrictions at issue are demonstrated by the Great Barrington Declaration, a statement authored by three respected epidemiologists: Dr. Martin Kulldorf, Professor of Medicine at Harvard University, Dr. Sunetra Gupta, Professor at Oxford University, and Dr. Jay Bhattacharya, Professor at Stanford University. The Great Barrington Declaration has

---

[33] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (February 26, 2021).

since been endorsed by 11,482 medical and public health scientists and 34,116 medical practitioners.[34] The Great Barrington Declaration merits quotation in full:

> As infectious disease epidemiologist and public health scientists we have grave concerns about the damaging physical and mental health impact of prevailing COVID-19 policies, and recommend an approach we call Focused Protection.
>
> Coming from both right and left, and around the world, we have devoted our careers to protecting people. Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health-leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice.
>
> Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed.
>
> Fortunately, our understanding of the virus is growing. We know that vulnerability to death from COVID-19 is more than a thousand-fold higher in the old and infirm than in the young. Indeed, for children, the threat of COVID-19 is less dangerous than many other harms, including influenza.
>
> As immunity builds in the population, the risk of infection to all -including the vulnerable- falls. We know that all populations will eventually reach herd immunity – i.e. the point at which the rate of new infections is stable – and that this can be assisted by (but is not dependent upon) a vaccine. Our goal should therefore be to minimize mortality and social harm until we reach herd immunity.
>
> The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to lead their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection.
>
> Adopting measures to protect the vulnerable should be the central aim of health responses to COVID-19. By way of example, nursing homes should use staff with acquired immunity and perform PCR testing of other staff and all visitors. Staff rotation should be minimized. Retired people living at home should have groceries and other essentials delivered to their home. When possible, they should meet family members outside rather than inside. A comprehensive list of measures, including approaches to multigenerational households, can be implemented, and is well within the scope and capability of public health professionals.
>
> Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such has hand-washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young, low-risk adults should work normally, rather than from home. Restaurants and

---

[34] https://gbdeclaration.org/view-signatures (November 10, 2020).

businesses should be open. Arts, music, sport and other cultural activities
should resume. People who are more at risk may participate if they wish,
while society as a whole enjoys the protections conferred on the vulnerable by
those who have built up herd immunity.[35]

163.    A policy that promotes one positive outcome--the reduction of the negative

effects of COVID-19--without considering the countervailing negative effects of the policy

itself, is the very definition of arbitrary, particularly when alternative measures are available

that would effectively promote all desired outcomes. There is no reason to believe that the

negative health outcomes associated with the coercive state actions at issue were considered by

defendants in formulating the Orders, restrictions, and enforcement measures at issue in this

matter.

164.    The September 30, 2020, equity metric incorporated in the August 28, 2020,

Order is arbitrary insofar as it requires all counties to submit a plan as a condition to moving to

a lower tier, i.e., a lower level of restrictions. The required plan has no bearing on whether the

conditions justifying the exercise of emergency power--the spread of COVID-19 and the

incidence of the resulting negative health effects--prevail at levels justifying a particular level

of restrictions.

165.    The indefinite duration of the measures at issue is a further indication that the

measures are arbitrary. Governor Newsom indicated in public remarks in April, 2020, that

living under emergency orders is the new normal for the next 12-18 months.[36] Little has

changed in the intervening months to change the picture. The stay-at-home Order imposed on

March 19, 2020, remains, effectively, in effect, in San Diego County. The August 28, 2020,

Order, as modified by the September 30, 2020 equity component, is in effect indefinitely.

Under this Order, the best plaintiffs can hope for is reopening their restaurants at 50%

capacity.

166.    The ever-changing requirements imposed on plaintiffs and other businesses and

organizations are a further indication of the arbitrary nature of the measures at issue. Plaintiffs

---

[35] https://gbdeclaration.org/ (November 20, 2020).
[36] https://www.youtube.com/watch?v=wQW0QGthFV4 (November 10, 2020).

have been prohibited from offering indoor and outdoor service, had the restriction lifted, subject to conditions, only to have indoor and outdoor dining banned again. Condition upon condition is imposed, with the County Defendants micromanaging the presentation of music at plaintiffs' restaurants, including a requirement that all singers must be no closer than ten feet to other musicians or patrons. Perpetually changing, and ever-expanding, restrictions imposed by executive fiat are hallmarks of arbitrary rule. Even recourse to political means to modify the measures at issue has been compromised by the Governor's exercise of emergency powers. Governor Newsom invoked emergency powers to unilaterally change the state's voting rules for the November, 2020, general election to require that all registered voters be sent vote-by-mail ballots.[37]

167.   The designation of essential and non-essential businesses, i.e., those allowed to operate, under the Orders and restrictions at issue, is also characterized by arbitrary distinctions. While some businesses that have been allowed to operate are clearly critical to human needs during an emergency, other preferred businesses have been allowed to operate notwithstanding the fact that they pose risks equal to or greater than other businesses deemed non-essential. In response to lobbying, the State Defendants amended the list of "essential" businesses to include cannabis retailers. Under current guidelines, film, television and music production has been allowed to resume,[38] despite the fact that these activities involve indoor activity comparable to restaurants and other hospitality and entertainment venues.

168.   The designation of essential and non-essential businesses also arbitrarily places the burden of stopping the spread of COVID-19 on a limited class of persons and businesses. By way of example, entertainment venues, tourist destinations, restaurants and wineries have been, and continue to be, either shutdown or severely circumscribed in their operations. Businesses providing personal services—such as barbers, cosmetologists, nail salons, and even doctors and other medical professionals not providing treatment for COVID-19—have been

---

[37] Executive Order N-64-20, May 8, 2020
[38] https://covid19.ca.gov/industry-guidance/#music-tv-film (November 10, 2020).

similarly restricted in their operations and completely shut down at times. Meanwhile certain segments of the economy—such as large discount and hardware retailers, and fast food restaurants—have remained in operation continuously and have even experienced increases in revenues and profits. Additionally, during the initial shut-downs of March 2020, "big-box" retailers were restricted to the sale of only those goods deemed "essential," closing the "non-essential goods" sections of their retail establishments, and maintaining tight controls on capacity limitations, social distancing, etc., "in the interest of public health." Yet sales for these "non-essential" retail products was resumed in Summer 2020, including allowing the 2020 holiday shopping season to proceed, perpetuating exposure for millions of consumers and employees for non-essential retail business operations, while restrictions prohibiting Plaintiffs' abilities to operate and earn a living continue even now. IF the public health issue were truly at the core of the Executive Orders, the burden would not be borne by Plaintiffs' industries alone.  Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions, at any time, if preliminary and permanent injunctive relief is not granted.

169.   Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

170.   Plaintiffs have no adequate remedy at law, and will suffer irreparable harm to their protected liberty and property interests, unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

171.   Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983-Fourteenth Amendment Procedural Due Process)

172.   Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

173. Procedural protections must be afforded when the government acts to deprive individuals of protected liberty or property interests. *Matthews v. Eldridge*, 424 U.S. 319, 322 (1976). Procedural due process does not forbid the government from depriving individuals of a protected interest, but, rather, requires the government to employ adequate procedures that ensure the fairness of any deprivation. *See McNabb v. United States*, 318 U.S. 332, 347 (1943). The "involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." O'*Connor v. Donaldson*, 422 U.S. 563, 580 (1975).

174. Defendants have deprived plaintiffs of their protected liberty and property interests without providing notice and an opportunity to be heard. Defendants have imposed Orders and restrictions with the force of law through the exercise of executive power without providing an opportunity for plaintiffs, and other members of the public, to contest or challenge the resulting limitations on their fundamental rights. The Orders and restrictions have been in place in one form or another for over twelve months and will remain in effect for an indefinite period into the future.

175. Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions, at will, if preliminary and permanent injunctive relief is not granted.

176. Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

177. Plaintiffs have no adequate remedy at law, and will suffer irreparable harm to their protected liberty and property interests, unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

178. Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

**THIRD CAUSE OF ACTION**

**(42 U.S.C. § 1983-Fourteenth Amendment Equal Protection)**

179.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

180.  The Fourteenth Amendment to the United States Constitution requires states to govern impartially. Classifications that subject similarly situated persons or classes of persons to differing treatment violate the equal protection guarantee of the Fourteenth Amendment.

181.  Strict scrutiny applies to classifications that impinge on fundamental rights. *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

182.  The Orders and restrictions imposed by defendants impinge on the fundamental rights of plaintiffs and the people of the State of California to freedom from confinement and to travel, associate, engage in business and trade, seek gainful employment, and, generally, be left alone to engage in otherwise lawful pursuits.

183.  The Orders and restrictions imposed by defendants are based on arbitrary classifications and criteria that are not rationally related to promoting public health, that promote the interests of favored groups without reference to the impact of the activities in question on the transmission of COVID-19, and that shift the burden of the response to COVID-19 to a limited class of persons and businesses.

184.    The right to equal protection guaranteed by the Fourteenth Amendment is also violated by enforcement measures that intentionally, and without rational basis, treat persons or groups differently from others similarly situated. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). The San Diego County Defendants have violated plaintiffs' right to equal protection by intentionally enforcing health regulations, and the Orders and restrictions at issue, differently against similarly situated restaurants.

185.     Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions, at any time, if preliminary and permanent injunctive relief is not granted.

186.     Plaintiffs have been damaged by the Orders and restrictions imposed and enforced by defendants.

187.     Plaintiffs have no adequate remedy at law, and will suffer irreparable harm to their protected liberty and property interests, unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

188.     Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

## FOURTH CAUSE OF ACTION

### (42 U.S.C. § 1983-Fifth Amendment)

189.     Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

190.     The Takings Clause of the Fifth Amendment of the U.S. Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

191.     "The Fifth Amendment…was designed to bar Government from forcing people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

192.     Defendants' imposition and enforcement of Orders restricting the operation of plaintiffs' businesses for an indefinite period, and having no stated end date, has caused both a regulatory and physical taking of plaintiffs' property without just compensation. At a minimum, defendants' Orders and restrictions have effected a partial taking. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). Defendants' unprecedented and highly disruptive Orders and restrictions have significantly reduced plaintiffs' revenues,

profits, and income, resulting in significant uncompensated harm to plaintiffs' distinct, investment-backed, expectations in their businesses.  If defendants' unconstitutional Orders and restrictions are not preliminarily and permanently enjoined, plaintiffs are threatened with the imminent total loss of their protected property interests in their investments, revenues, profits, income, and the value of their businesses.

193.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions, at will, if preliminary and permanent injunctive relief is not granted.

194.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

195.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

196.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

### FIFTH CAUSE OF ACTION

### (42 U.S.C. § 1983-Commerce Clause)

197.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

198.    The Commerce Clause of the United States Constitution provides that the United States Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, Section 8, Clause 3.

199.    The Commerce Clause prohibits states from exercising sovereign authority that excessively burdens interstate commerce. "[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations

1    designed for that salutary purpose nevertheless may further the purpose so marginally, and

2    interfere with commerce so substantially, as to be invalid under the Commerce Clause."

3    *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981).

4         200.   Plaintiffs engage in substantial interstate commerce and engage in activities that

5    have a substantial effect on interstate commerce. In particular, Plaintiff Knite's business

6    depends substantially on those traveling between Yuma, Arizona, and San Diego, California,

7    along Highway Interstate 8.

8         201.   Residents and businesses in the State of California engage in billions, if not

9    trillions, of dollars of interstate commerce through employment, the purchase and sale of

10   goods and services, and by serving thousands, if not millions, of travelers who visit California

11   annually from other states and foreign countries.

12        202.   The Orders and restrictions imposed and enforced by defendants excessively

13   burden interstate commerce by precluding plaintiffs, and the people of the State of California,

14   and travelers from other state and countries, from engaging in substantial and wide-ranging

15   economic, business and employment activities, as well as simply traveling to and from the

16   State of California.

17        203.   Under the legal authority under which they purport to act, defendants are able to

18   reinstate any previously imposed Orders and restrictions if preliminary and permanent

19   injunctive relief is not granted.

20        204.   Plaintiffs have been damaged by the unconstitutional Orders and restrictions

21   imposed and enforced by defendants.

22        205.   Plaintiffs have no adequate remedy at law and will suffer irreparable harm to

23   their protected liberty and property interests unless the court enjoins enforcement of the

24   unconstitutional Orders and restrictions imposed by defendants.

25        206.   Plaintiffs are entitled to declaratory relief and temporary, preliminary and

26   permanent injunctive relief invalidating or restraining enforcement of the unconstitutional

27   Orders and restrictions imposed by defendants.

28

**SIXTH CAUSE OF ACTION**

**(42 U.S.C. § 1983-First Amendment)**

207.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

208.    The First Amendment to the United States Constitution prohibits states from infringing the right of the people to free speech and peaceful assembly and to petition the government for a redress of grievances.

209.    The County Defendants have retaliated against plaintiffs for the exercise of their rights to free speech, lawful assembly and to petition the government for a redress of grievances by serving a number of plaintiffs with Cease and Desist Orders within hours or days of said plaintiffs publicly declaring their intent to refuse to accede to the unconstitutional Covid restrictions imposed upon them.

210.    Plaintiffs have suffered damage to their protected liberty and property interests -including continued restrictions upon and closures of their businesses- by reason of the County Defendants' retaliation and coercion in violation of plaintiffs' First Amendment rights.

211.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins the County Defendants' violations of their First Amendment rights.

212.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the County Defendants' violations of their First Amendment rights.

**SEVENTH CAUSE OF ACTION**

**Taking Private Property for Public Use without Just Compensation**

**(U.S. Const. Fifth Amendment, Takings Clause)**

213.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

214.     The Takings Clause of the Fifth Amendment of the U.S. Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

215.     The Fifth Amendment's Takings Clause "was designed to bar Government from forcing people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

216.     Defendants' imposition and enforcement of Orders restricting the operation of plaintiffs' businesses for an indefinite period and having no stated end date has caused both a regulatory and physical taking of plaintiffs' property without just compensation. At a minimum, defendants' Orders and restrictions have effected a partial taking. See, *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). Defendants' unprecedented and highly disruptive Orders and restrictions have significantly reduced plaintiffs' revenues, profits and income, resulting in significant uncompensated harm to plaintiffs' distinct, investment-backed expectations in their businesses.  If defendants' unconstitutional Orders and restrictions are not preliminarily and permanently enjoined, plaintiffs are threatened with the imminent total loss of their protected property interests in their investments, revenues, profits, income and the value of their businesses.

217.     Under the legal authority under which they purport to act, Defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

218.     Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

219.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

220.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

**EIGHTH CAUSE OF ACTION**

**Taking or Damaging Private Property for Public Use**

**(Cal. Const. Art. 1, § 19)**

221.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

222.    The Taking or Damaging Clause of the California Constitution provides that private property "may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.." Cal. Const. Art. I, § 19.

223.    Defendants have not first paid any compensation to Plaintiffs, or to a court, and have not provided any indication, during the almost one year under the State of emergency, or any intention of paying just compensation to the Plaintiffs.

224.    Under the legal authority under which they purport to act, Defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

225.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

226.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

227.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

## NINTH CAUSE OF ACTION

### Commandeering Private Property or Personnel

### (CGC § 8572)

228.  Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

229.  Gov. Code § 8572 states, "In the exercise of the emergency powers hereby vested in him during a state of war emergency or state of emergency, the Governor is authorized to commandeer or utilize any private property or personnel deemed by him necessary in carrying out the responsibilities hereby vested in him as Chief Executive of the state and the state shall pay the reasonable value thereof."

230.  By ordering their establishments to be closed to sit down dining, and ordering their employees to Stay-at-Home, Defendants have utilized Plaintiffs private property and personnel for carrying their objectives of controlling COVID-19 cases.  However, Defendants have failed to pay any value for Plaintiff's private property and personnel for carrying out their objectives.

231.  Under the legal authority under which they purport to act, Defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

232.  Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

233.  Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

234.  Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

**TENTH CAUSE OF ACTION**

**Equal Protection**

**(Cal. Const. Art. I, § 7)**

235.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

236.    The California Constitution provides, " [a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; . . . ." Cal Const. Art. I, §7.  The equal protection clause requires states to govern impartially. Classifications that subject similarly situated persons or classes of persons to differing treatment violate the equal protection guarantee of the Fourteenth Amendment.

237.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

238.    Plaintiffs have been damaged by the Orders and restrictions imposed and enforced by defendants.

239.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

240.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

**ELEVENTH CAUSE OF ACTION**

**Right of Liberty**

**(Cal. Const. Art. 1, § 1)**

241.    Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

242.    Article I, Section 1, of the California Constitution declares the following rights: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

243.    Plaintiffs, their patrons, and the people, have been under continuous orders to stay at home.  The people are authorized to leaved there home only for reasons specifically authorized activities.  Plaintiffs, their patrons, and the people, have been subject to financial devastation, mental and physical subjugation, arbitrary and concentrated government, and widespread infection by the virus, due to the Defendants' ineffective Orders and regulations

244.    The Defendants' Orders and regulations violate the rights of the Plaintiffs, their patrons, and the people, to be free and independent, to enjoy lift and liberty, to acquire and possess property, and to pursue and obtain happiness.

245.    Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

246.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

247.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

248.    Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

**TWELVETH CAUSE OF ACTION**

**Commerce Clause**

**(U.S. Const. Fourteenth Amendment)**

249.   Plaintiffs incorporate by reference as if fully restated here the foregoing allegations.

250.   The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary wrongful, state action regardless of the fairness of the procedures employed. *Zinermon v. Bosch*, 494 U.S. 113, 125 (1990).

251.   The Commerce Clause of the United States Constitution provides that the United States Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, Section 8, Clause 3.

252.   Plaintiffs and Coalition members engage in substantial interstate commerce and engage in activities that have a substantial effect on interstate commerce. These plaintiffs purchase goods and services in interstate commerce and serve travelers who visit California from other states and foreign countries.

253.   Residents and businesses in the State of California engage in billions, if not trillions, of dollars of interstate commerce through employment, the purchase and sale of goods and services, and by serving thousands, if not millions, of travelers who visit California annually from other states and foreign countries.

254.   The Orders and restrictions imposed and enforced by defendants excessively burden interstate commerce by precluding plaintiffs and the people of California from engaging in substantial and wide-ranging economic, business and employment activities.

255.   Under the legal authority under which they purport to act, defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

256.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by defendants.

257.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected liberty and property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

258.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restrictions imposed by defendants.

**THIRTEENTH CAUSE OF ACTION**

**Conditions Warrant Termination of State of Emergency**

**(Cal. Gov. Code § 8629)**

259.    Plaintiffs hereby realleges and incorporates by reference of the above paragraphs in their entirety.

260.    CGC § 8558 of the California Emergency Services Act, in paragraph (b), defines the meaning of a "State of emergency."  With respect to COVID-19, the relevant parts state: " 'State of emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by conditions such as . . . epidemic, . . . or other conditions, . . . which, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city **and require the combined forces of a mutual aid region or regions to combat** . . . " (emphasis added).

261.    Any requirement for the combined forces of a mutual aid region or regions to combat the virus has passed, if it ever existed.

262.    After a surge passed though California infecting a large segment of the population, the Regional Stay-at-Home order was lifted in the Greater Sacramento region on January 12, 2021, and for all of California on January 25, 2020,.  All counties in California are

now operating under the "Blueprint for a Safer Economy," in which each county is individually evaluated and assigned a tier.

263.    On March 28, 2021, the State reported that 17,136,841 doses of the COVID-19 vaccine had been administered statewide, and, as of March 27, 2021, 1,627,828 doses had been administered in San Diego County, further improving conditions against a surge requiring the combined forces of a mutual aid region or regions to combat.

264.    Cal. Gov. Code § 8629 states that the " Governor shall proclaim the termination of a state of emergency at the earliest possible date that conditions warrant." The current conditions do not fall under the definition of a state of emergency as defined in Gov. Code § 8558(b) due to the lack of a requirement for the combined forces of a region or regions to combat the virus. Thus, the current conditions warrant a proclamation of the termination of the state of emergency by the Governor, as mandated by Cal. Gov. Code § 8629.

265.    Under the legal authority under which they purport to act, Defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

266.    Plaintiffs have been damaged by the unlawful Orders and restrictions imposed and enforced by defendants.

267.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

268.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

**FOURTEENTH CAUSE OF ACTION**

**The Original Proclamation of a State of Emergency Did Not Meet the Statutory**

**Threshold for a State of Emergency**

**(Cal. Gov. Code § 8558)**

269.    Plaintiffs hereby realleges and incorporates by reference of the above

paragraphs in their entirety.

270.    CGC § 8558(b) of the California Emergency Services Act, defines a State of

emergency in terms of conditions which by reason of their magnitude "require the combined

forces of a mutual aid region or regions to combat."  Thus, under Govt. Code § 8558(b), the

conditions for a State of emergency mandate that the combined forces of a mutual aid region

or regions are required.

271.    In the State of emergency Proclamation of March 4, 2020, Defendant Newsom

proclaimed,

> "WHEREAS I find that the conditions caused by COVID-19 are **likely** to require the
> combined forces of a mutual aid region or regions to appropriately respond; . . ."
> (emphasis added).  Defendant Newsom included the term "likely" from the prior phrase
> in the statute: " . . . which, by reason of their magnitude, are or are **likely** to be beyond
> the control of the services, personnel, equipment, and facilities of any single county,
> city and county, or city and require the combined forces of a mutual aid region or
> regions to combat, . . ." (emphasis added).

272.    A reading of "conditions . . . are likely to . . . require" may seem to be a

plausible interpretation, but that interpretation is defeated by the reading of the alternative of

"conditions . . . are . . . require", which reading is extremely awkward and directs to an

interpretation of the phrase "are or are likely to" only applies to the immediately adjacent

phrase "be beyond the control."  Thus, Defendant Newsom's finding that conditions which by

reason of their magnitude are **likely** to require the combined forces of a mutual aid region or

regions to appropriately respond does not reach the threshold of actually requiring the

combined forces of a mutual aid region or regions, as mandated by Govt. Code § 8558(b).

273.    CGC § 8558(b) of the California Emergency Services Act, defines a State of

emergency in terms of conditions "which, by reason of their magnitude, **are or are likely** to be

beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city . . ." (emphasis added).  Thus, Govt. Code § 8558(b) mandates that the conditions are **likely** to be beyond the control of a single jurisdiction.

274.    In the State of emergency Proclamation of March 4, 2020, Defendant Newsom further proclaimed, "WHEREAS if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care **may** exceed locally available resources, . . . ; and WHEREAS state and local health departments must use all available preventative measures . . . , which will require access to services, personnel, equipment, facilities, and other resources, **potentially** including resources beyond those currently available . . ." (emphasis added).

275.    Defendant Newsom's use of the terms "may" and "potentially" are admissions that the conditions at the time of the Proclamation were not then found likely to be beyond the control of the relevant single jurisdiction.  Defendant Newsom's finding that conditions where the number of persons requiring medical care **may** exceed locally available resources, and **potentially** including resources beyond those currently available, fail to reach the threshold of **likely** to be beyond the control of the relevant single jurisdiction, as mandated by Govt. Code § 8558(b).

276.    Therefore, Defendant Newsom's Proclamation of a State of emergency did not meet the statutory threshold on conditions supporting a Proclamation of a State of emergency. Absent a valid Proclamation of a State of emergency, supported by sufficient findings at the time of the proclamation, the subsequent Orders and regulations are null and void.

277.    Under the legal authority under which they purport to act, Defendants are able to reinstate any previously imposed Orders and restrictions if preliminary and permanent injunctive relief is not granted.

278.    Plaintiffs have been damaged by the unlawful Orders and restrictions imposed and enforced by defendants.

279.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by defendants.

280.     Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by defendants.

## FIFTEENTH CAUSE OF ACTION

**The Governor's Claim to Broad Emergency Power Violates the Non-Delegation Doctrine**

**(Cal. Const. Art. III, § 3)**

281.     Plaintiffs hereby reallege and incorporate by reference of the above paragraphs in their entirety.

282.     Article Three, Section 3 of the California Constitution declares "the powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power **may not** exercise either of the others except as permitted by this Constitution" (emphasis added).

283.     "The legislative power of this state is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve the right to themselves the powers of initiative and referendum." Cal. Const. art. IV, § 1.

284.     "The supreme executive power of this State is vested in the Governor. The Governor shall see that the law is faithfully executed." Cal. Const. art. IV, § 1.

285.     The issue of whether Defendant Newsom has the power or authority to assume the Legislature's role of creating legislative policies and enactments such as in the form of Executive Orders N-33-20 and N-60-20. is currently before the Court of Appeal of the State of California, Third Appellate District, by Case No. C093006.

286.    Plaintiffs assert Executive Orders N-33-20 and N-60-20 exceed the Governor's authority and renders both orders unconstitutional and invalid.

287.    Plaintiffs have been damaged by the unconstitutional Orders and restrictions imposed and enforced by Defendants.

288.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm to their protected property interests unless the court enjoins enforcement of the unconstitutional Orders and restrictions imposed by Defendants.

289.    Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining enforcement of the unconstitutional Orders and restriction imposed by Defendants.

## PRAYER

Plaintiff prays for an Order awarding the following relief against the State Defendants:

A.    Preliminary and permanent injunctive relief precluding the enforcement of the following Orders:

1.  Governor Newsom's March 4, 2020, Emergency Order;

2.  Governor Newsom's March 19, 2020, Emergency Order;

3.  Governor Newsom's May 4, 2020, Emergency Order;

4.  The State Public Health Officer's March 19, 2020 Order;

5.  The State Public Health Officer's June 18, 2020, Face Mask Guidance;

6.  The State Public Health Officer's June 28, 2020, Order;

7.  The State Public Health Officer's July 13, 2020, Order;

8.  The State Public Health Officer's July 15, 2020, Order;

9.  The State Public Health Officer's August 28, 2020 Order;

10. The State Public Health Officer's October 20, 2020, COVID-19 INDUSTRY

GUIDANCE: Shopping Malls, Destination Shopping Centers, and Swap Meets.

11. The State Public Health Officer's November 19, 2020 Order;

12. Governor Newsom's December 5, 2020 REGIONAL STAY AT HOME Order;

13. The State Public Health Officer's January 6, 2021 Travel Advisory;

B.     A judicial declaration that the following Orders violate plaintiffs' rights under the Fourteenth and Fifth Amendments to the United State Constitution:

1. Governor Newsom's March 4, 2020, Emergency Order;

2. Governor Newsom's March 19, 2020, Emergency Order;

3. Governor Newsom's May 4, 2020, Emergency Order;

4. The State Public Health Officer's March 19, 2020 Order;

5. The State Public Health Officer's June 18, 2020, Face Mask Guidance;

6. The State Public Health Officer's June 28, 2020, Order;

7. The State Public Health Officer's July 13, 2020, Order;

8. The State Public Health Officer's July 15, 2020, Order;

9. The State Public Health Officer's August 28, 2020 Order;

10. The State Public Health Officer's October 20, 2020, COVID-19

INDUSTRY GUIDANCE: Shopping Malls, Destination Shopping Centers, and Swap Meets.

11. The State Public Health Officer's November 19, 2020 Order;

12. Governor Newsom's December 5, 2020 REGIONAL STAY AT HOME Order;

13. The State Public Health Officer's January 6, 2021 Travel Advisory;

C.     Attorney's fee and costs;

D.     All such other relief the court deems just and proper.

1    Plaintiff prays for an Order awarding the following relief against the County and City

2    Defendants:

3         A.        Preliminary and permanent injunctive relief precluding the enforcement of the

4    following Orders:

5              1.  Governor Newsom's March 4, 2020, Emergency Order;

6              2.  Governor Newsom's March 19, 2020, Emergency Order;

7              3.  Governor Newsom's May 4, 2020, Emergency Order;

8              4.  The State Public Health Officer's March 19, 2020, Order;

9              5.  The State Public Health Officer's June 18, 2020, Face Mask Guidance;

10             6.  The State Public Health Officer's June 28, 2020, Order;

11             7.  The State Public Health Officer's July 13, 2020, Order;

12             8.  The State Public Health Officer's July 15, 2020, Order;

13             9.  The State Public Health Officer's August 28, 2020, Order;

14             10. The State Public Health Officer's October 20, 2020, COVID-19

15                 INDUSTRY GUIDANCE: Shopping Malls, Destination Shopping Centers,

16                 and Swap Meets.

17             11. The State Public Health Officer's November 19, 2020, Order;

18             12. Governor Newsom's December 5, 2020, REGIONAL STAY AT HOME

19                 Order;

20             13. The State Public Health Officer's January 6, 2021, Travel Advisory;

21             14. The County Public Health Officer's March 13, 16, 18, and 27, 2020, Orders

22             15. The County Public Health Officer's April 2, 3, 8, 10,23,24, 27, and 30,

23                 2020, Orders;

24             16. The County Public Health Officer's May 7, 8, 9, 21, 22, 26, and 29, 2020,

25                 Orders;

26             17. The County Public Health Officer's June 3, 15, 18, 29, and 30, 2020,

27                 Orders;

28

1          18. The County Public Health Officer's July 6, 14, and 29, 2020, Orders;

2          19. The County Public Health Officer's August 7, 21, and 31, 2020, Orders;

3          20. The County Public Health Officer's September 9, and 25, 2020, Orders;

4          21. The County Public Health Officer's October 9, 2020, Order;

5          22. The County Public Health Officer's November 2, 13, and 20, 2020, Orders;

6          23. The County Public Health Officer's December 3, 5, 9, and 18, 2020,

7              Orders;

8          24. The County Public Health Officer's January 28, 2021, Order;

9          25. The County Public Health Officer's February 6, 2021, Order;

10     B.     Preliminary and permanent injunctive relief prohibiting retaliation based upon,

11 and coercion to preclude, plaintiffs' exercise of their First Amendment rights to freedom of

12 speech and assembly and to petition the government for a redress of grievances;

13     C.     A judicial declaration that the following Orders violate plaintiffs' rights under

14 the Fourteenth and Fifth Amendments to the United State Constitution:

15          1.   Governor Newsom's March 4, 2020, Emergency Order;

16          2.   Governor Newsom's March 19, 2020, Emergency Order;

17          3.   Governor Newsom's May 4, 2020, Emergency Order;

18          4.   The State Public Health Officer's March 19, 2020, Order;

19          5.   The State Public Health Officer's June 18, 2020, Face Mask Guidance;

20          6.   The State Public Health Officer's June 28, 2020, Order;

21          7.   The State Public Health Officer's July 13, 2020, Order;

22          8.   The State Public Health Officer's July 15, 2020, Order;

23          9.   The State Public Health Officer's August 28, 2020, Order;

24          10. The State Public Health Officer's October 20, 2020, COVID-19

25              INDUSTRY GUIDANCE: Shopping Malls, Destination Shopping Centers,

26              and Swap Meets.

27          11. The State Public Health Officer's November 19, 2020, Order;

28

12. Governor Newsom's December 5, 2020, REGIONAL STAY AT HOME Order;

13. The State Public Health Officer's January 6, 2021, Travel Advisory;

14. The County Public Health Officer's March 13, 16, 18, and 27, 2020, Orders

15. The County Public Health Officer's April 2, 3, 8, 10,23,24, 27, and 30, 2020, Orders;

16. The County Public Health Officer's May 7, 8, 9, 21, 22, 26, and 29, 2020, Orders;

17. The County Public Health Officer's June 3, 15, 18, 29, and 30, 2020, Order3;

18. The County Public Health Officer's July 6, 14, and 29, 2020, Orders;

19. The County Public Health Officer's August 7, 21, and 31, 2020, Orders;

20. The County Public Health Officer's September 9, and 25, 2020, Orders;

21. The County Public Health Officer's October 9, 2020, Order;

22. The County Public Health Officer's November 2, 13, and 20, 2020, Orders;

23. The County Public Health Officer's December 3, 5, 9, and 18, 2020, Orders;

24. The County Public Health Officer's January 28, 2021, Order;

25. The County Public Health Officer's February 6, 2021, Order;

D.    Attorney's fee and costs;

E.    Compensatory damages in the amount $10,000,000 or such other amounts proven at trial;

F.    Punitive damages in the amount $1,500,000;

G.    All such other relief the court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury.

COMPLAINT

1   Date: March 31, 2021

2                                         s/ Gary G. Kreep

3                                         Gary G Kreep
                                          Law Office of Gary G Kreep
4                                         *Attorneys for Plaintiffs Pine Valley House Resort, LLC,*
                                          *Nica Katherine Knite, Descanso Junction Restaurant and*
5                                         *Catering, Tammy Cooker, BELGON Incorporated,*
                                          *Belynn R. Gonzales, Christos Kapetanios, Christos*
6                                         *Kapetanios (individual), GONZO & FERN, LLC,*
                                          *Michael Aguirre, Steven Asaro, Steve Asaro (individual),*
7                                         *Michael Anthony Andrews, Michael Anthony Andrews*
                                          *(individual), La Salle Conglomerate, LLC, Daniel La*
8                                         *Salle, Ramona Fitness Center, LLC, Peter San Nicolas,*
                                          *Shayna San Nicolas, Rudfords, LLC, Jeff Kacha,*
9                                         *Acoustic Ales Brewing Experiment, Inc., Tommaso*
                                          *Maggiore, HOO1, Inc., HOO2, Inc., Craig MacDonald,*
10                                        *and ReOpen San Diego Small Business Coalition*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT